# IN THE SUPREME COURT OF TENNESSEE
## AT JACKSON
### November 5, 2015 Session Heard at Memphis

## STATE OF TENNESSEE v. MICHAEL SMITH

**Appeal by Permission from the Court of Criminal Appeals**
**Criminal Court for Shelby County**
**No. 10-06590    James M. Lammey, Jr., Judge**

---

**No. W2013-01190-SC-R11-CD – Filed June 24, 2016**

---

A jury convicted Michael Smith ("the Defendant") of aggravated assault, committed by violating a protective order, and evading arrest. The trial court imposed an effective sentence of ten years, eleven months, and twenty-nine days' incarceration. The Defendant appealed his convictions and sentences, which the Court of Criminal Appeals affirmed. State v. Smith, No. W2013-01190-CCA-R3-CD, 2014 WL 3954062, at *21 (Tenn. Crim. App. Aug. 13, 2014). The Defendant then requested permission to appeal to this Court, alleging the following errors: (1) the trial court's failure to require the State to make an election of offenses; (2) the insufficiency of the indictment; (3) the trial court's refusal to allow the Defendant to sit at counsel table; (4) the trial court's ruling that, should he elect to testify, the Defendant could be impeached with prior convictions; (5) the trial court's denial of a mistrial after allowing a witness to testify about a different criminal proceeding against the Defendant; (6) the admission of the victim's testimony about the Defendant's prior bad acts; and (7) the trial court's failure to confine the flight instruction to the aggravated assault charge. We granted the Defendant's request for permission to appeal. Upon our review of the record and the applicable law, we hold that the State's failure to elect an offense as to the aggravated assault charge resulted in plain error. Accordingly, we reverse the Defendant's conviction for aggravated assault and remand the matter to the trial court for a new trial on that charge. We affirm the Defendant's conviction for evading arrest.

**Tenn. R. App. P. 11 Appeal by Permission;**
**Judgment of the Court of Criminal Appeals Affirmed in Part,**
**Reversed in Part; Remanded**

JEFFREY S. BIVINS, J., delivered the opinion of the Court, in which SHARON G. LEE, C.J., and CORNELIA A. CLARK and HOLLY KIRBY, JJ., joined.

Lance R. Chism (on appeal) and Randal G. Rhea (at trial), Memphis, Tennessee, for the appellant, Michael Smith.

Herbert H. Slatery III, Attorney General and Reporter; Andrée Blumstein, Solicitor General; Jeffrey D. Zentner, Assistant Attorney General; Amy P. Weirich, District Attorney General; and Paul Goodman, Assistant District Attorney General, for the appellee, the State of Tennessee.

**OPINION**

**Factual and Procedural Background**

On October 14, 2010, the Defendant was indicted on one count each of aggravated assault, evading arrest, and resisting official detention. The Defendant was tried before a jury on January 8-11, 2013. Prior to the commencement of trial, defense counsel stated, "I would request that my client be allowed to sit at the defense table." The trial court responded,

> No. He's not a lawyer, and I'm not going to allow that. I know he thinks he's a lawyer. But it took you years and years to get to where you are; and I don't want him running the show. You're the lawyer, and he's not; and so I'm not going to allow it.

Accordingly, the Defendant was seated behind his attorney at trial.

The State then proceeded with its case-in-chief. Kimberly Chrestman, the alleged victim in this case, testified that she began dating the Defendant in 2008. In 2009, there had been some incident with the Defendant which had required Ms. Chrestman to contact law enforcement. She could not recall, however, if an order of protection had been entered against the Defendant in that matter. Nevertheless, Ms. Chrestman and the Defendant went back to living together for some time after the 2009 incident.

On the evening of July 20, 2010, the Defendant was at Ms. Chrestman's home in Olive Branch, Mississippi. At some point, Ms. Chrestman decided that she wanted to leave her house to bake a cake at her mother's house, but the Defendant did not want her to leave because "[h]e controlled ever[y] aspect of everything [she] did." According to Ms. Chrestman, "He was smashing me into the door where I couldn't get out. He took

my keys. . . . [D]uring this tussle, . . . he kicked a bucket of paint over on our kitchen floor. I mean, . . . he has been keeping me captive like this forever."

After some time, the Defendant drove Ms. Chrestman to her mother's home, telling her that she was not allowed to drive herself because she had "lost [her] privileges." Ms. Chrestman confirmed that she received threats from the Defendant on that date. After spending several hours at her mother's house, Ms. Chrestman called a friend to take her to another friend's home on North Watkins in Memphis, Shelby County, Tennessee ("the Watkins residence"). She wanted to go to the Watkins residence because she "did not want [the Defendant] to be able to get a hold of [her] anymore."

After arriving at the Watkins residence on the evening of July 20, 2010, Ms. Chrestman was sitting in the computer room with her friends, when they heard "things rattling" and "rocks crunching" just outside the window. Ms. Chrestman was terrified, and her "instinct kicked in right then" that the noises were caused by the Defendant. She stated, "[B]ecause he had stalked me before, I know what it sounds like when he comes up to a window." When she looked through the blinds of the window, she saw the Defendant standing just outside the window, which caused her to scream.

At some point after calling the police,[1] Ms. Chrestman decided to go to the nearby house of a different friend, Paul Wagoner, thinking that the Defendant would not know where she was. This house was located on the corner of Somerset in Memphis, Shelby County, Tennessee ("the Somerset residence"). However, after she arrived at the Somerset residence, and while she was explaining to Mr. Wagoner what had occurred at the previous house, she saw the Defendant looking through the small window in the wooden door of the Somerset residence. Ms. Chrestman was "[a]bsolutely terrified," and she immediately called the police. The police responded and eventually took the Defendant into custody.

When asked about specific threats she received from the Defendant, Ms. Chrestman responded, "I don't remember exactly any threats [he] made; but, I mean, this

---

[1] The record is unclear as to exactly what happened with respect to the police getting called to the Watkins residence and whether the police responded to that call. Ms. Chrestman testified that she left the Watkins residence "after we thought that [the Defendant] left because the police came trying to catch [the Defendant]. So, after we thought he had gone and maybe the police had chased him off or whatever; I'm just – I know he's going to come back because he's done that to me before. He will wait until the police leaves, and he comes back." On cross examination, however, the defense, referring to the incident on Watkins, asked, "And [the police] never showed up?" to which Ms. Chrestman responded, "Yes. And I don't – I don't remember exactly what happened . . . ."

happened all the time. Everything starts to blend in together when you've been through this for that many years with a person."

On cross examination, Ms. Chrestman denied that she was drinking on the evening of July 20, 2010. Although she could not give approximate times, she recalled that she arrived at the Watkins residence at "nighttime" and arrived at the Somerset residence "early towards the morning."

When asked whether she saw a weapon on the Defendant during this encounter at the Somerset residence, Ms. Chrestman answered, "No. I didn't see him with it, but Shannon saw him with it at the other house when he went outside. That's how I knew he had it."

Ms. Chrestman confirmed that she met with Javier Bailey, the attorney who previously had represented the Defendant ("Prior Counsel"), on multiple occasions in his office. Defense counsel asked, "Did you tell [Prior Counsel] that [the Defendant] never threatened you and that you only called the police so [the Defendant] would be taken away so you could use drugs?," to which Ms. Chrestman responded, "Absolutely not. Absolutely not. That's crazy."

Ms. Chrestman acknowledged that she visited the Defendant in jail in October 2010 but stated that it was in order to get the keys to the Defendant's vehicle released to her so that she could retrieve the vehicle from the impound lot.

Officer Jonathan Gross with the Memphis Police Department ("MPD") was working a shift from approximately 11:00 p.m. on the evening of July 20, 2010, to 7:00 a.m. on the morning of July 21, 2010. He responded to a situation in the early morning of July 21, 2010, "[n]ear Watkins and Somerset" in Memphis. He stated, "I saw a male white attempting to flee from surrounding officers that were telling him to stop and to come to him, at which point he still proceeded to the barrier at North Parkway trying to escape." Officer Gross observed the individual, whom he identified at trial as the Defendant, standing approximately twenty feet above him at a multi-level intersection. The Defendant then ran the other direction from the barrier "through the brush." Officer Gross estimated that approximately six officers were involved in the Defendant's apprehension, which took approximately ten minutes from the time Officer Gross arrived at the scene. The next time that he saw the Defendant was after the Defendant was in custody in the back of a patrol vehicle. He recalled that the Defendant's legs appeared to be "cut up from . . . the thorns – brush."

Officer Timothy Jackson with the MPD testified that he worked a shift, known as the "Alpha shift," from 11:30 p.m. on July 20, 2010, to 7:30 a.m. on July 21, 2010. He responded to a call on July 21, 2010, near Somerset and Watkins. He was advised that "there was a [domestic assault] suspect going from backyard to backyard." As a result of this information, when Officer Jackson arrived at the scene, he began walking through backyards on Somerset. Officer Jackson "slipped coming down off a fence" and injured his foot, so he was not present when the suspect was taken into custody.

Officer Andrew Bishop with the MPD testified that, on July 21, 2010, he responded to the scene of a domestic disturbance on Somerset near Watkins. He assisted in setting up a perimeter in order to contain and locate the suspect because the suspect was running from the officers at the scene. At some point, he observed the suspect, whom he identified at trial as the Defendant, "running from the officers; but by the time [the Defendant] saw [Officer Bishop] and a few other officers, he stopped and started to double back." Officer Bishop testified,

> Eventually, as we started to close in the perimeter, [the Defendant] broke past two of the officers; but then I actually could see him a little bit more clearer then – could identify him a little bit more. They chased him. Once he did break this perimeter as we closed it up, he then ran through some neighborhoods where other officers were closer to him than I was at that time. He went over a few fences; and they announced on the radio that he doubled back and was coming back. At that time, me and another officer – Officer Gerard – came face to face with him; and Officer Gerard grabbed ahold of him. He tried to spin away from him, and he wrestled him to the ground; and that's when I joined in to try to apprehend the individual.

After the Defendant was taken into custody, he complained of chest pains, so the officers called an ambulance for him. Officer Bishop noted that the Defendant also appeared to have some minor scrapes on his body.

The State also read a stipulation to the jury, and the trial court admitted it as an exhibit. This stipulation referenced a May 6, 2009 restraining order imposed on the Defendant, with Ms. Chrestman as the named victim. The State then concluded its proof.

At the initiation of the Defendant's case-in-chief, defense counsel re-called Ms. Chrestman. Defense counsel asked Ms. Chrestman about a recent property dispute involving the Defendant and Ms. Chrestman. Following an objection by the State, the following discussion occurred in a bench conference:

Defense: There is a dispute. She said there's a dispute, and it's relevant. It goes towards her bias; it goes towards her credibility. I'm going to put Mr. Bailey on the stand, and he's going to talk about her changing her story. This is relevant to that. . . .

Court: You might be opening up a can of worms.

State: Many doors – many doors are opening.

Following further discussion, the trial court sustained the State's objection to defense counsel's questions regarding the property dispute. Ms. Chrestman then confirmed that she spoke with the police on July 21, 2010, regarding the events that transpired at the Somerset residence.

The defense then called Prior Counsel as a witness. Prior Counsel testified regarding his representation of the Defendant. He stated that he met "[n]umerous times" with Ms. Chrestman during the course of his representation. On a few of those occasions, Ms. Chrestman attended court proceedings in support of the Defendant. Defense counsel asked Prior Counsel whether Ms. Chrestman ever had told him that she was at the Somerset residence "getting high." The State objected on the grounds that the question was improper because it had not been asked of Ms. Chrestman. The trial court held a bench conference before overruling the State's objection.

After the bench conference, defense counsel asked Prior Counsel if Ms. Chrestman ever had told him that she was "getting high on cocaine or crack cocaine at [the Somerset residence], and that she exaggerated her story to the police because she wanted [the Defendant] to go away because he was interfering with her getting high." The State objected on the grounds that the question was leading, was not relevant, had not been asked of Ms. Chrestman, and exceeded the scope of the question that was discussed during the bench conference.

The trial court listened to the recording of Ms. Chrestman's testimony on cross examination and subsequently permitted a jury-out voir dire examination of Prior Counsel. The trial court determined that defense counsel could ask Prior Counsel the disputed question but that the State would be permitted to elicit testimony from Prior Counsel that the Defendant, in a prior criminal matter involving Ms. Chrestman ("Prior Case"),[2] raised the defense that he had been attempting to prevent Ms. Chrestman from

---

[2] In the Prior Case, the Defendant was convicted of assault and aggravated burglary after attacking an individual named Matthew Ronning outside of Mr. Ronning's apartment, entering the apartment, and engaging in an altercation with Ms. Chrestman. State v. Smith, No. W2011-01630-CCA-

using drugs at the time of the alleged criminal activity. The trial court also concluded that, whether or not defense counsel decided to ask the disputed question, the State could introduce evidence of the Defendant's conviction in the Prior Case.

The trial then resumed in the presence of the jury. Defense counsel asked Prior Counsel, "Did [Ms. Chrestman] tell you that [the Defendant] did not threaten her?" Prior Counsel responded in the affirmative. Defense counsel then asked, "Did [Ms. Chrestman] tell you that [the Defendant] did not assault her?," to which Prior Counsel again responded in the affirmative. On cross examination, Prior Counsel clarified that Ms. Chrestman's statements were made prior to the preliminary hearing in this case. During re-direct examination, Prior Counsel testified that Ms. Chrestman did not attend the preliminary hearing.

During re-cross examination, the State asked whether Prior Counsel had represented the Defendant "on another matter in which Ms. Chrestman was an alleged victim of [the Defendant]." Defense counsel asked to approach the bench with the State, but the trial court stated that it would overrule defense counsel's objection. The State then asked Prior Counsel whether he had raised this same argument—that the Defendant was attempting to prevent Ms. Chrestman from using drugs—in the Prior Case and whether the Defendant was convicted in that case. Prior Counsel responded in the affirmative. At the conclusion of Prior Counsel's testimony, the Defendant moved for a mistrial based on the State's proffering of this proof. The trial court denied the motion for a mistrial.

Defense counsel then requested a hearing to determine whether the State could impeach the Defendant's credibility with the following convictions should he testify: a 1992 destruction of property conviction, a 1998 escape conviction, a 2003 attempted rape conviction, a 2003 rape conviction, a 2011 assault conviction, and a 2011 aggravated burglary conviction.[3] The trial court concluded that the rape conviction, the attempted rape conviction, and the aggravated burglary conviction would be admissible for impeachment purposes if the Defendant testified. Defense counsel subsequently called

---

R3-CD, 2013 WL 3702369, at *1 (Tenn. Crim. App. July 12, 2013). The Prior Case was appealed, and the Court of Criminal Appeals reversed the Defendant's convictions and remanded the case for a new trial based on the trial court's error in "constructively amending the indictment in its charge to the jury." Id. at *19. At the conclusion of his second trial, the Defendant was convicted of aggravated burglary, and that conviction was affirmed by the Court of Criminal Appeals. State v. Smith, No. W2014-00900-CCA-R3-CD, 2015 WL 6166606, at *1 (Tenn. Crim. App. Oct. 21, 2015), perm. app. denied (Tenn. Jan. 19, 2016).

[3] The State filed its notice of intent to impeach the Defendant's credibility with these convictions prior to trial.

the Defendant to the stand and asked him if he wished to testify. The Defendant responded, "Based on the judge's decision, no."

Candy Barron, an acquaintance of Ms. Chrestman and the Defendant and the property manager for a small apartment complex in Memphis that the Defendant owned, testified that Ms. Chrestman and the Defendant recently were involved in a property dispute over a house in Olive Branch, Mississippi. The Defendant presented no additional proof.

The State put on no rebuttal proof. After deliberating, the jury convicted the Defendant of aggravated assault and evading arrest. The jury acquitted the Defendant of resisting official detention. The trial court sentenced the Defendant to ten years' incarceration for the aggravated assault conviction and eleven months, twenty-nine days' incarceration on the evading arrest conviction. The trial court ordered these sentences to run consecutively to each other for a total effective sentence of ten years, eleven months, and twenty-nine days' incarceration.[4] The Court of Criminal Appeals affirmed the Defendant's conviction and sentences. Smith, 2014 WL 3954062, at *21. We subsequently granted the Defendant's application for permission to appeal.

## Analysis

Because the election of offenses issue is dispositive of the Defendant's conviction of aggravated assault, we will address it first.

### Election of Offenses

The Defendant contends that the trial court failed to compel an election of offenses as to the aggravated assault charge. The record supports the Defendant's position. The State contends, and the Defendant concedes, however, that the Defendant has waived this issue due to his failure to raise the issue at trial or in his motions for new trial. Nevertheless, we may consider this issue under plain error review. See Tenn. R. App. P. 36(b); State v. Hatcher, 310 S.W.3d 788, 808 (Tenn. 2010) ("[W]hen 'necessary to do substantial justice,' this Court has the authority to 'consider an error that has affected the substantial rights of a party at any time, even though the error was not raised in the motion for a new trial or assigned as error on appeal.'" (quoting Tenn. R. App. P. 36(b)). Thus, we will proceed to consider whether the Defendant is entitled to plain error relief.

---

[4] The trial court also ordered these sentences to run consecutively to sentences the Defendant had received for prior convictions.

-8-

For this Court to conclude that plain error occurred, five prerequisites must be satisfied:

> (a) the record must clearly establish what occurred in the trial court; (b) a clear and unequivocal rule of law must have been breached; (c) a substantial right of the accused must have been adversely affected; (d) the accused [must not have] waive[d] the issue for tactical reasons; and (e) consideration of the error [must be] "necessary to do substantial justice."

State v. Smith, 24 S.W.3d 274, 282 (Tenn. 2000) (quoting State v. Adkisson, 899 S.W.2d 626, 641-42 (Tenn. Crim. App. 1994)). If any one of these factors is not satisfied, we need not consider the remaining factors. Id. at 283. "When asserting plain error, the defendant bears the burden of persuading the appellate court that the trial court committed plain error and that the error was of sufficient magnitude that it probably changed the outcome of the trial." State v. Hester, 324 S.W.3d 1, 56 (Tenn. 2010) (citing State v. Bledsoe, 226 S.W.3d 349, 354-55 (Tenn. 2007)).

The record contains the transcript from the trial, including closing arguments, so the first element of plain error – that the record clearly establishes what occurred at the trial court – is satisfied. See Smith, 24 S.W.3d at 282.

The second element is that a clear and unequivocal rule of law was breached. Id. When the State adduces proof of multiple instances of conduct that each match the allegations contained in a single charged count, the State, at the close of its case-in-chief, must "elect" the distinct conduct about which the jury is to deliberate in returning its verdict on the relevant count. See State v. Knowles, 470 S.W.3d 416, 423 (Tenn. 2015); State v. Adams, 24 S.W.3d 289, 294 (Tenn. 2000); State v. Brown, 992 S.W.2d 389, 391 (Tenn. 1999); State v. Walton, 958 S.W.2d 724, 727 (Tenn. 1997); State v. Shelton, 851 S.W.2d 134, 136-37 (Tenn. 1993); Burlison v. State, 501 S.W.2d 801, 804 (Tenn. 1973). As this Court has explained,

> This election requirement serves several purposes. First, it ensures that a defendant is able to prepare for and make a defense for a specific charge. Second, election protects a defendant against double jeopardy by prohibiting retrial on the same specific charge. Third, it enables the trial court and the appellate courts to review the legal sufficiency of the evidence. The most important reason for the election requirement, however, is that it ensures that the jurors deliberate over and render a verdict on the same offense.

Adams, 24 S.W.3d at 294 (citations omitted).

Historically, the election requirement has been applied primarily in cases involving sexual offenses against children. Such cases may involve repeated criminal actions over an extended period by the defendant against a child, who may have difficulty remembering the specifics of each offense. To accommodate the inherent uncertainty the prosecution faces with young children testifying about specific events on particular dates, the State may charge a single offense as having occurred over a significant span of time. For instance, in Brown, the State charged the defendant with one count of child rape allegedly committed between March 1, 1993, and September 30, 1993. 992 S.W.2d at 391. To further accommodate the distinct challenges of sex offense cases involving young children, this Court relaxed the usual strictures of Tennessee Rule of Evidence 404(b), which restricts the admission of a defendant's bad acts other than those for which he is on trial. See, e.g., State v. Rickman, 876 S.W.2d 824, 829 (Tenn. 1994) ("We reaffirm, however, the special rule applied in Shelton[, 851 S.W.2d at 136,] and [State v.] Brown[, 762 S.W.2d 135, 137 (Tenn. 1988),] admitting evidence of other sex crimes when an indictment is not time specific and when the evidence relates to sex crimes that allegedly occurred during the time as charged in the indictment. . . . Unlike evidence of prior crimes excluded by Bunch [v. State, 605 S.W.2d 227, 229 (Tenn. 1980),] and Tenn. R. Evid. 404(a) & (b), evidence of a prior sex crime that is necessarily included within the charge of the indictment is also necessarily relevant to the issues being tried and, therefore, is admissible." (citing Tenn. R. Evid. 402)). However, when the State is allowed to adduce proof that, for instance, the defendant committed three sexual offenses against a child victim during the time period specified in the charging instrument, the trial court must require the State to elect the offense upon which it wishes the jury to deliberate. Id. ("In such cases, the State must elect at the close of its proof-in-chief as to the particular incident for which a conviction is being sought."). In this way, the defendant's fundamental right to a unanimous jury verdict is protected.

Occasionally, this Court has required an election of offenses in cases involving other types of offenses. For instance, in Murphy v. State, 77 Tenn. 373, 376-77, 380 (Tenn. 1882), the Court reversed the defendant's conviction of selling intoxicating beverages within four miles of an incorporated institution of learning because, although he was indicted on only one offense, the State adduced proof of three offenses. This Court held that the trial court committed reversible error when it refused to make the prosecutor elect which offense the jury was to consider. Id. at 377. Additionally, in Holt v. State, 64 S.W. 473, 474 (Tenn. 1901), this Court held that an election of offenses was required when the State proved more than one incident of the defendant's unlawfully carrying a pistol. Indeed, the election of offenses doctrine predates significantly the relaxation of Tennessee Rule of Evidence 404(b) for child sex crime cases. See, e.g.,

-10-

Vinson v. State, 203 S.W. 338, 339 (Tenn. 1918) (requiring election of offenses when State adduced proof of three instances of single charged offense of statutory rape).

Moreover, this Court has implied in two more recent cases that, but for instances such as a statutory exception, see State v. Buford, 216 S.W.3d 323, 325-26 (Tenn. 2007), or a continuous course of conduct offense, see State v. Hoxie, 963 S.W.2d 737, 743 (Tenn. 1998), the election requirement would apply to offenses outside of the child sexual abuse context. Additionally, the Court of Criminal Appeals has applied the election requirement more frequently to cases involving other types of offenses. See, e.g., State v. Bagwell, No. M2014-00017-CCA-R3-CD, 2015 WL 721069, at *7-8 (Tenn. Crim. App. Feb. 19, 2015) (affirming defendant's conviction for attempted murder and two counts of aggravated assault because the State "effectively elected [in its closing argument] the set of facts for which it was trying to establish the offenses" and the indictment also was specific as to which offense related to which charge); State v. Carman-Thacker, No. M2014-00757-CCA-R3-CD, 2015 WL 1881135, at *6 (Tenn. Crim. App. Apr. 24, 2015), perm. app. denied (Tenn. Sept. 17, 2015) (reversing defendant's conviction for willful abuse, neglect, or exploitation because the State failed to elect the abuse, neglect, or exploitation on which it was relying); State v. Yancey, No. W2011-01543-CCA-R3-CD, 2012 WL 4057369, at *9 (Tenn. Crim. App. Sept. 17, 2012), perm. app. denied (Tenn. Jan 14, 2013) (holding that the trial court committed plain error by failing to require the State to elect which felony it was relying on for the defendant's charge of employing a firearm during the commission of a dangerous felony); see also State v. Dyck, No. E2001-00476-CCA-R3-CD, 2002 WL 661921, at *3 (Tenn. Crim. App. Apr. 22, 2002), perm. app. denied (Tenn. Oct. 28, 2002) (examining the election requirement with respect to the defendant's conviction for theft and noting that "the concerns addressed by the election requirement are not limited to prosecutions for sex offenses"). For reasons we will address below, the particular facts of this case necessitate the application of the election doctrine.

The indictment in this case for the offense of aggravated assault stated the following:

THE GRAND JURORS . . . present that: MICHAEL SMITH on *July 21, 2010* in Shelby County, Tennessee, and before the finding of this indictment, did unlawfully and knowingly, after having been enjoined by an order of the general Sessions Criminal Court of Shelby County, Tennessee, a court of competent jurisdiction, from threatening to commit Domestic Assault or Assault against KIMBERLY CHRESTMAN, threaten to commit Domestic Assault or Assault against KIMBERLY CHRESTMAN, in

-11-

violation of T.C.A. 39-13-102, against the peace and dignity of the State of Tennessee.

(Emphasis added). The gravamen of this charge is that, on July 21, 2010, the Defendant threatened to commit a domestic assault or an assault[5] against the victim after having been enjoined from doing so.

At trial, the victim, Ms. Chrestman, testified about three specific and separate incidents during which the Defendant allegedly threatened and/or terrified her. The first

---

[5] As defined by statute,

[a] person commits assault who:

> (1) Intentionally, knowingly or recklessly causes bodily injury to another;
>
> (2) Intentionally or knowingly causes another to reasonably fear imminent bodily injury; or
>
> (3) Intentionally or knowingly causes physical contact with another and a reasonable person would regard the contact as extremely offensive or provocative.

Tenn. Code Ann. § 39-13-101(a) (Supp. 2009). Domestic assault, as defined by Tennessee statute, is an assault, pursuant to Tennessee Code Annotated section 39-13-101, committed against a domestic abuse victim. Tenn. Code Ann. § 39-13-111(b) (Supp. 2009). A "domestic abuse victim" may be any of the following:

(1) Adults or minors who are current or former spouses;

(2) Adults or minors who live together or who have lived together;

(3) Adults or minors who are dating or who have dated or who have or had a sexual relationship, but does not include fraternization between two (2) individuals in a business or social context;

(4) Adults or minors related by blood or adoption;

(5) Adults or minors who are related or were formerly related by marriage; or

(6) Adult or minor children of a person in a relationship that is described in subdivisions (a)(1)-(5).

Tenn. Code Ann. § 39-13-111(a).

-12-

instance allegedly occurred in Mississippi on July 20, 2010. That instance is not embraced within the charged offense.

The second incident allegedly occurred in Shelby County, Tennessee, at the Watkins residence. The specific date on which this second incident occurred is unclear, however. Regarding this incident, the following colloquy occurred between defense counsel and Ms. Chrestman:

Q: And when did you get to Watkins? – on the night of the 20th or the morning of the 21st?

A: The night – the night – that very same night.

. . . .

Q: So, you were at Watkins on the 20th; and then when did you go to 1401 Somerset? – that night or in the morning?

A: I think by the time that we got able to get out of that house with everything going on, I believe like it was early towards the morning.

Q: Was it still dark outside when you went from Watkins to Somerset?

A: If it was, I think it was probably going to be light very soon.

Although this testimony indicates that Ms. Chrestman arrived at the Watkins residence on July 20, 2010, we find this testimony to be unclear as to whether the victim's interaction with the Defendant at the Watkins residence occurred on July 20, 2010, or July 21, 2010. Indeed, Ms. Chrestman's testimony that "it was probably going to be light very soon" suggests that the date of the Watkins encounter could have been July 21, 2010. We note that the Defendant did not object to the admissibility of the testimony regarding this incident.[6]

Finally, the third incident allegedly occurred at the Somerset residence in Shelby County, Tennessee, on July 21, 2010.

---

[6] We note that the Defendant, in fact, did object to the admissibility of testimony regarding the incident in Mississippi, but the trial court, without explanation, responded to the objection, "Overruled. Ask your question."

-13-

The State's proof at trial allowed the jury to consider the latter two incidents as each matching the single charge in the indictment for an aggravated assault, committed by violating an order of protection, occurring on July 21, 2010. As noted above, the Defendant did not object to Ms. Chrestman's testimony regarding the Watkins incident.[7] Because the State adduced proof of more than one incident that each matched the allegations of the charging instrument, the election of offenses doctrine was implicated.

The State, at the conclusion of its case-in-chief, failed to elect the specific instance for which it wanted the jury to consider for the aggravated assault charge. See Knowles, 470 S.W.3d at 423 ("The State . . . must elect at the close of its case-in-chief the particular offense for which it is seeking a conviction." (citing Rickman, 876 S.W.2d at 828)). Furthermore, the trial court did not require the State to make an election between these two incidents or instruct the jury as to which incident the jury was to consider for the aggravated assault charge. See Burlison, 501 S.W.2d at 804 ("[I]t was the duty of the trial judge to require the State, at the close of its proof-in-chief, to elect the particular offense . . . upon which it would rely for conviction, and to properly instruct the jury so that the verdict of every juror would be united on the one offense."). Therefore, a clear and unequivocal rule of law was breached. See Smith, 24 S.W.3d at 282.

We next consider whether a substantial right of the Defendant was adversely affected. See id. The primary purpose for the election requirement is to ensure that the jury is deliberating about a single instance of alleged criminal conduct so that the jury may reach a unanimous verdict. See Shelton, 851 S.W.2d at 137; Adams, 24 S.W.3d at 294 ("The most important reason for the election requirement, however, is that it ensures that the jurors deliberate over and render a verdict on the same offense."). Indeed, this Court has characterized this right to a unanimous verdict as "fundamental, immediately touching the constitutional rights of an accused." Burlison, 501 S.W.2d at 804. Therefore, such election errors are subject to a constitutional harmless error analysis. See State v. Qualls, 482 S.W.3d 1, 18-20 (Tenn. 2016) (applying constitutional harmless error analysis to assess election error); State v. Rodriguez, 254 S.W.3d 361, 371 (Tenn. 2008) ("The test used to determine whether a non-structural constitutional error is harmless is whether it appears beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." (internal citation and quotation marks omitted)).

The Court of Criminal Appeals held in this case that, "[b]ased upon the indictment and the State's closing argument, the Defendant's right to a unanimous jury verdict was

---

[7] Because the Defendant did not object to this testimony nor raise the issue of its admissibility on appeal, we need not address whether any of the proof should have been excluded under Tennessee Rule of Evidence 404(b). We emphasize that, by applying the election requirement in this case, we in no way are relaxing the standards on admissibility of prior bad acts under Tennessee Rule of Evidence 404(b).

-14-

not violated." Smith, 2014 WL 3954062, at *6. Specifically, the intermediate appellate court relied on the fact that the incident in Olive Branch, Mississippi, as well as that the incident at the Watkins residence, occurred on July 20, 2010, rather than July 21, 2010. Id. However, as indicated above, the victim's testimony was unclear as to whether the incident at the Watkins residence occurred on July 20 or 21, 2010. Moreover, the testimony of the MPD officers does not exclude July 21, 2010, as the date of the Watkins incident. The Court of Criminal Appeals, in determining that no substantial right of the Defendant was adversely affected, also relied on the prosecutor's statement during closing argument that "[t]here was no proof that the defendant was at the house on Watkins." Id.

This Court previously has not addressed specifically whether the State's closing argument can "cure" the failure of the State to properly elect the facts for the jury to consider for proof of a particular offense or whether the State's closing argument can render harmless beyond a reasonable doubt the State's failure to elect an offense. Several Court of Criminal Appeals cases have held that closing argument can "cure" an election error or provide an "effective substitute" such that no error even occurred. See, e.g., State v. Branham, No. E2014-02071-CCA-R3-CD, 2016 WL 106603, at *12 (Tenn. Crim. App. Jan. 8, 2016) (holding that "any error made by the State in its election of offenses was *cured* during the prosecutor's closing argument" (emphasis added)); State v. Marks, No. W2012-00564-CCA-R3-CD, 2013 WL 1870426, at *5 (Tenn. Crim. App. May 3, 2013), perm. app. denied (Tenn. Oct. 16, 2013) ("More[o]ver, any error that may have occurred was *cured* by the prosecutor's electing the oral sex in closing argument and the trial court's recalling the jury and issuing the supplemental instruction." (emphasis added)); State v. Busby, No. M2004-00925-CCA-R3-CD, 2005 WL 711904, at *6 (Tenn. Crim. App. Mar. 29, 2005), perm. app. denied (Aug. 25, 2008) (concluding that "the prosecutor provided such an *effective substitute* during his closing argument in this case" (emphasis added)); State v. Dearry, No. 03C01-9612-CC-00462, 1998 WL 47946, at *13 (Tenn. Crim. App. Feb. 6, 1998), perm. app. denied (Jan. 19, 1999) (holding that "the prosecutor's closing argument effectively served as an election of the proof upon which the State wished to proceed").

Still other decisions from the Court of Criminal Appeals do not use language as strong as "cure" or "effective substitute" and rather merely consider a prosecutor's closing argument in determining whether the failure to elect was harmless beyond a reasonable doubt. See, e.g., State v. Osborne, No. M2005-00893-CCA-R3-CD, 2006 WL 2682773, at *5 (Tenn. Crim. App. Sept. 7, 2006) (holding that it was harmless error when the prosecutor focused on a single incident in closing argument); State v. Ramey, No. E2003-01840-CCA-R3-CD, 2004 WL 1580662, at *10 (Tenn. Crim. App. July 15, 2004)

(holding that any error was harmless when prosecutor stated in closing argument that the State was electing a specific incident the victim had testified to with particularity).

We hold that the notion that a prosecutor's closing argument can "cure" a failure to elect offenses or even provide an "effective substitute" is problematic because the failure to elect an offense is a constitutional error, even if that error is later deemed to be harmless beyond a reasonable doubt. Rather, we hold that a reviewing court may consider a prosecutor's statements in closing argument solely as part of its constitutional harmless error analysis.

Under this holding, we now consider the prosecutor's statements at closing argument to aid us in our determination of whether the failure to elect in this case was harmless beyond a reasonable doubt. The State, in its appellate brief before this Court, specifically points to the prosecutor's statement at closing argument that "[t]here was no proof that the defendant was at the house on Watkins." This statement, however, is directly contradicted by the evidence. The victim, Ms. Chrestman, testified that, while at the Watkins residence, she and her friends heard "things rattling" and "rocks crunching" just outside the window. When she looked through the blinds of the window, she saw the Defendant standing just outside the window, which caused her to scream. Therefore, contrary to the prosecutor's statement, the State clearly presented proof of the Defendant's presence at the Watkins residence through the victim's testimony.

The State argues that the prosecutor's misstatement at closing argument nevertheless "directed the jury away from considering that incident to support the aggravated-assault charge." We disagree. The State's closing argument included the following:

> From there, Ms. Chrestman did something that – who can blame her? – she wanted to get away from the defendant, and she got a ride to an address on Watkins. This is the night of July the 20th. She was at the address on Watkins. She was with people. She was seeking protection from the defendant, and she heard noises outside; and she was terrified; and she said the police were called.

> Now, we didn't bring in any police officers to testify about that; but be that as it may, I submit to you, when you consider that the defendant was arrested not far from there – remember the testimony, and there's no dispute about this; was that the house on Watkins is close to the house on Somerset – the second house to which she went – both of which were in Memphis and Shelby County; that Ms. Chrestman heard noises outside.

-16-

She said that she knew what that was. She knew – I asked her, "Could it have been an animal?" She knew what it was. She knew that the defendant had found her.

Well, I guess she could have been mistaken. There was no proof that the defendant was at the house on Watkins. I grant you that; but I submit to you that Ms. Chrestman was right; that the defendant had caught up to her at the house on Watkins. Again, control, possession, ownership. She belonged to that man the way he saw it.

. . . .

This case was almost provable without [Ms.] Chrestman because the state has proof of a court order against the defendant; and the state can prove that the defendant was arrested there at the residence on Somerset where Ms. Chrestman was trying to hide . . . .

. . . .

In the early morning hours, [the Defendant] goes to where [Ms.] Chrestman was – I submit not just at Somerset, but that he went to Watkins; and what did he do? – he made noises outside. He climbed up so he could look through the window scaring the dickens out of Ms. Chrestman. And he didn't go to the front door. He didn't knock politely on the door. He didn't go up and ring the doorbell. He was stalking.

Upon our review of the entire closing argument made by the State, we conclude that the State by no means clarified which of the two Shelby County incidents it was asking the jury to consider for the charge of aggravated assault. Indeed, the closing argument actually weighs against finding the failure to elect to be harmless beyond a reasonable doubt. Thus, we hold that the Defendant's constitutional right to a unanimous verdict was adversely affected. See Smith, 24 S.W.3d at 282.

We next consider whether the Defendant waived the election issue for tactical reasons. See id. The record contains no indication that the Defendant waived this issue for tactical reasons. This Court has held that an absence of indicia in the trial record that a defendant has waived an issue for tactical reasons is sufficient to satisfy this criterion of plain error. See State v. Gomez, 239 S.W.3d 733, 742 (Tenn. 2007) ("[T]he record in this case is silent and does not establish that the Defendants made a tactical decision to waive their . . . claims. . . . Accordingly, we conclude that the fourth prerequisite for

plain error has been met."); State v. Cooper, 321 S.W.3d 501, 506 (Tenn. 2010) (determining that the fourth element of plain error review had been established where "there [wa]s no indication that [the defendant] waived the issue for tactical reasons"). Accordingly, we hold that this element of plain error review is satisfied.

Finally, we conclude that consideration of the election error is "necessary to do substantial justice." Smith, 24 S.W.3d at 282. We reiterate that a defendant's right to a unanimous verdict is "fundamental, immediately touching the constitutional rights of an accused." Burlison, 501 S.W.2d at 804. Therefore, the State's failure to elect an offense as to the aggravated assault charge, and the trial court's failure to require the State to do so, resulted in plain error. Accordingly, we hold that the Defendant's aggravated assault conviction must be reversed.

Although we have concluded that the aggravated assault conviction must be reversed on the election issue, we find it necessary to address some of the additional issues before this Court either because our assessment of the issue may provide guidance to the trial court on remand or because the issue pertains to the Defendant's remaining conviction of evading arrest.

*Sufficiency of the Indictment*

We turn next to the Defendant's contention that the aggravated assault charge is fatally defective because it varies from the relevant statutory language. Challenges to the validity of an indictment present questions of law and, thus, are reviewed de novo. State v. Hill, 954 S.W.2d 725, 727 (Tenn. 1997).

According to the United States Constitution and the Tennessee Constitution, an indictment must provide the accused with "the nature and cause of the accusation" being made against him/her. U.S. Const. amend. VI; Tenn. Const. art. I, § 9. Pursuant to Tennessee Code Annotated section 40-13-202 (2006), an indictment must present the facts in such a way that "enable[s] a person of common understanding to know what is intended." This Court has held that "an indictment is valid if it provides sufficient information (1) to enable the accused to know the accusation to which answer is required, (2) to furnish the court adequate basis for the entry of a proper judgment, and (3) to protect the accused from double jeopardy." Hill, 954 S.W.2d at 727 (citing State v. Byrd, 820 S.W.2d 739, 741 (Tenn. 1991); VanArsdall v. State, 919 S.W.2d 626, 630 (Tenn. Crim. App. 1995); State v. Smith, 612 S.W.2d 493, 497 (Tenn. Crim. App. 1980)). Furthermore, reference to the applicable statute "within the indictment may be sufficient to place the accused on notice of the charged offense." State v. Sledge, 15 S.W.3d 93, 95 (Tenn. 2000). In other words, citing the statute in the indictment provides the defendant

with notice regarding the mens rea of the offense, gives notice regarding the offense upon which to enter judgment, and protects against future prosecution for the same offense. See State v. Carter, 988 S.W.2d 145, 149 (Tenn. 1999).

Indictments are reviewed from an "enlightened standpoint of common sense and right reason rather than from the narrow standpoint of petty preciosity, pettifogging, technicality or hair splitting fault finding." Hill, 954 S.W.2d at 728 (quoting United States v. Purvis, 580 F.2d 853, 857 (5th Cir. 1978)). In a string of cases since Hill, this Court has held that an indictment meets statutory and constitutional requirements if it "achieve[s] the overriding purpose of [providing] notice to the accused," noting the Court's "relaxation of common law pleading requirements and its reluctance to elevate form over substance." State v. Hammonds, 30 S.W.3d 294, 300 (Tenn. 2000); see also Sledge, 15 S.W.3d at 95; Crittenden v. State, 978 S.W.2d 929, 931 (Tenn. 1998); Ruff v. State, 978 S.W.2d 95, 99 (Tenn. 1998).

For convenience, we repeat again the indicted charge of aggravated assault:

THE GRAND JURORS . . . present that: MICHAEL SMITH on July 21, 2010 in Shelby County, Tennessee, and before the finding of this indictment, *did unlawfully and knowingly, after having been enjoined* by an order of the general Sessions Criminal Court of Shelby County, Tennessee, a court of competent jurisdiction, from threatening to commit Domestic Assault or Assault against KIMBERLY CHRESTMAN, *threaten to commit Domestic Assault or Assault* against KIMBERLY CHRESTMAN, in violation of T.C.A. 39-13-102, against the peace and dignity of the State of Tennessee.

(Emphases added). The referenced statutory provision, Tennessee Code Annotated section 39-13-102(c), states in pertinent part:

A person commits aggravated assault who, after having been enjoined or restrained by an order, diversion or probation agreement of a court of competent jurisdiction from in any way causing or attempting to cause bodily injury or in any way committing or attempting to commit an assault against an individual or individuals, intentionally or knowingly *attempts to cause or causes* bodily injury *or commits or attempts to commit* an assault against the individual or individuals.

Tenn. Code Ann. § 39-13-102(c) (Supp. 2009) (emphases added).

The Defendant argues that the language in the indictment is insufficient to charge aggravated assault because "it fails to sufficiently track the language of Tennessee Code Annotated section 39-13-102(c)." He notes, specifically, that the words "threatening" and "threaten" do not appear in the statute. The State responds that the indictment merely says "threaten[ing]" to commit aggravated assault, rather than "attempt[ing]" to commit aggravated assault, as stated in Tennessee Code Annotated section 39-13-102(c). The Court of Criminal Appeals concluded that the charge was sufficient, holding that "[t]he indictment in this case closely follows the statutory form of the crime, and the indictment is consistent with the requirements of Tennessee Code Annotated section 39-13-102." Smith, 2014 WL 3954062, at *7.

The charge of aggravated assault in this case consists of three elements: (1) intentional or knowing mens rea; (2) the assailant "attempts to cause or causes bodily injury or commits or attempts to commit an assault"; and (3) the assailant has been "enjoined or restrained by an order, diversion or probation agreement" from committing the offense as described within element (2). See Tenn. Code Ann. § 39-13-102(c). The indictment in this case stated that the mens rea was "unlawfully and knowingly," which is sufficient to charge the requisite mens rea under the statute. See id.; Sledge, 15 S.W.3d at 95 (holding that a mens rea of "unlawfully" in the indictment was sufficient because the indictment referenced the applicable statute which required a "reckless" mens rea). The indictment also alleges that the Defendant was enjoined by a court order, which satisfies the third element. See Tenn. Code Ann. § 39-13-102(c). The issue, therefore, pertains to the second element – whether the indictment sufficiently alleged that the Defendant "attempt[ed] to cause or cause[d] bodily injury or commit[ted] or attempt[ed] to commit an assault" against Ms. Chrestman. Tenn. Code Ann. § 39-13-102(c).

The indictment's language as to the second element states that the Defendant did "threaten to commit Domestic Assault or Assault against Kimberly Chrestman." Black's Law Dictionary defines "threat" as "a declaration, express or implied, of an intent to inflict loss or pain on another." Black's Law Dictionary (10th ed. 2014). One of the statutory bases for assault is "[i]ntentionally or knowingly caus[ing] another to reasonably fear imminent bodily injury." Tenn. Code Ann. § 39-13-101(a)(2) (Supp. 2009). Therefore, we consider this indictment sufficient to point the Defendant to the specific legal basis for his charge.

Moreover, as noted above, this Court has held that a specific reference within the indictment to the relevant statute may provide the accused sufficient notice of the charged offense. See Sledge, 15 S.W.3d at 95; State v. Carter, 121 S.W.3d 579, 587 (Tenn. 2003) ("[A]n indictment which references the statute defining the offense is sufficient and

satisfies the constitutional and statutory requirements of <u>Hill</u>.").  The indictment, in fact, did reference the applicable statute – Tennessee Code Annotated section 39-13-102(c).

We conclude that the indictment provided to the Defendant sufficient notice of his charge for aggravated assault and provided to the trial court an adequate basis to enter a proper judgment.  <u>Hill</u>, 954 S.W.2d at 727.  To hold otherwise would require us to engage in the very "pettifogging, technicality or hair splitting" that this Court has noted that it seeks to avoid.  <u>See</u> <u>id.</u> at 728.  Therefore, we hold that the Defendant's indictment for aggravated assault was sufficient to permit the Defendant to be retried on that charge.

*Defendant Sitting at Counsel Table*

We next consider whether the trial court erred in refusing to allow the Defendant to sit at counsel table.  Initially, however, we must address the State's contention that the Defendant waived this issue.

On January 28, 2013, while represented by counsel, the Defendant filed, pro se, a motion for new trial.  In this pro se motion, he alleged, among other issues, error arising from the trial court's refusal to let him sit at counsel table during trial.  On March 21, 2013, defense counsel filed a "Motion for Judgment of Acquittal, or, in the Alternative, Motion for New Trial."  This motion did not include the counsel table issue.

On April 30, 2013, the trial court held a hearing at which defense counsel moved to withdraw from representing the Defendant based on an alleged conflict of interest with him.  The trial court granted defense counsel's motion and allowed the Defendant to argue, pro se, his motion for new trial.  The Defendant argued the counsel table issue, and the trial court addressed this issue on the merits.

The State nevertheless contends that the Defendant waived the counsel table issue because it was not raised in defense counsel's motion for new trial.  <u>See</u> Tenn. R. App. P. 3(e) (providing that "in all cases tried by a jury, no issue presented for review shall be predicated upon error in the admission or exclusion of evidence, jury instructions granted or refused, misconduct of jurors, parties or counsel, or other action committed or occurring during the trial of the case, or other ground upon which a new trial is sought, unless the same was specifically stated in a motion for a new trial; otherwise such issues will be treated as waived").  The State asserts that the Defendant's pro se motion for new trial is a nullity because the Defendant was represented by an attorney at the time it was filed and that, therefore, the issue was "never contained in any valid motion for new trial."  The State maintains that "it [was] not enough that the defendant raised [the issue] orally in the motion for new trial hearing because the defendant never reduced [it] to

-21-

writing." According to the State, this issue only should be considered under plain error review, which, the State contends, the Defendant has failed to demonstrate. See Smith, 24 S.W.3d at 282 (enumerating the elements of plain error).

The Defendant responds that, because he raised this issue in his pro se motion for new trial, attempted twice to terminate counsel in February 2013, and argued the motion for new trial pro se after the trial court granted defense counsel's motion to withdraw, this Court "should view his pro se motion for new trial as having preserved all issues that were alleged in that pleading."

As both parties correctly note, a defendant may not proceed pro se while simultaneously represented by counsel. See Hester, 324 S.W.3d at 31-34 (providing that a defendant may assert the right to self-representation or the right to counsel, but not both); State v. Davis, 141 S.W.3d 600, 615 n.12 (Tenn. 2004); State v. Muse, 637 S.W.2d 468, 470 (Tenn. Crim. App. 1982) (providing that a defendant may not file pro se motions while represented by counsel). However, in the present case, the Defendant was not represented by counsel at the time he argued his motion for new trial at the hearing. During the course of his argument, the Defendant argued the counsel table issue, and the trial court ruled on this issue on the merits. The Court of Criminal Appeals similarly elected to address this issue on the merits. See Smith, 2014 WL 3954062, at *18-19.

In light of these rather unique circumstances, we conclude that the counsel table issue was properly preserved for appeal. To rule in favor of the State's argument that this issue was "never contained in any valid motion for new trial, and [that] it [was] not enough that the defendant raised it orally in the motion for new trial hearing because the defendant never reduced it to writing," would elevate form over substance. See Lane v. State, 316 S.W.3d 555, 568 (Tenn. 2010) (rejecting argument that no guilty plea is valid unless the defendant is specifically asked "How do you plead?" because argument values form over substance); State v. Livingston, 197 S.W.3d 710, 716 (Tenn. 2006) (holding that to rule that the defendant did not have sufficient notice of the State's intent to seek enhanced sentencing "would be to impose a hyper-technical procedural requirement that elevates form over substance"); Sample v. State, 82 S.W.3d 267, 281 (Tenn. 2002) (Drowota, III, C.J., concurring) ("[T]his Court should not refuse to apply existing and established law merely because a claim is filed shortly before a scheduled execution. Indeed, such a rule would be . . . the ultimate exaltation of form over substance."); Hammonds, 30 S.W.3d at 300 (stating that the Court is reluctant "to elevate form over substance when evaluating the sufficiency of indictments"); State v. Henning, 975 S.W.2d 290, 298 (Tenn. 1998) (providing that, to hold that the principles guiding the trial court's decision upon a pretrial motion to suppress "require an appellate court, or a trial court considering a motion for new trial, to ignore trial evidence which reinforces or

-22-

negates the correctness of the pretrial ruling on the motion" would exalt form over substance).

Turning then to the merits of the issue, we review this alleged error under the abuse of discretion standard of review. See State v. Rice, 184 S.W.3d 646, 674-75 (Tenn. 2006) (reviewing trial court's refusal to allow defendant to sit at counsel table under abuse of discretion standard). A trial court abuses its discretion when it applies an incorrect legal standard, reaches an illogical conclusion, bases its decision on a clearly erroneous assessment of the evidence, or employs reasoning that causes an injustice to the complaining party. See State v. Davis, 466 S.W.3d 49, 61 (Tenn. 2015) (citing State v. Franklin, 308 S.W.3d 799, 809 (Tenn. 2010); State v. Clark, 452 S.W.3d 268, 287 (Tenn. 2014)). When a trial court exercises its discretion, it should place specific findings on the record to allow meaningful appellate review of the trial court's decision. See Am. Heritage Apartments, Inc. v. Hamilton Cnty. Water & Wastewater Treatment Auth., __ S.W.3d __, 2016 WL 1424458, at *16 (Tenn. Apr. 8, 2016) ("In order for an appellate court to conduct a meaningful review of a trial court's discretionary decision on class certification, the trial court must identify sufficient facts upon which it based its decision.").

The Court of Criminal Appeals denied relief to the Defendant on this issue, basing its decision on this Court's holding in Rice, 184 S.W.3d at 674. See Smith, 2014 WL 3954062, at *19. In Rice, this Court addressed a constitutional challenge to Rule 8.05 of the Rules of Practice and Procedure for Shelby County Criminal Court ("Local Rule 8.05"), which provides that, "[w]here space is available and with permission of the Court, the defendant may sit at counsel table with his or her attorney." 184 S.W.3d at 674. Although the Court ultimately denied relief to the defendant, the Court stated that "it is the better practice to allow a defendant to sit at counsel table." Id. at 675. Despite this clear statement, however, some courts have continued to deny defendants a seat at counsel table. See, e.g., State v. Thomas, No. W2014-00788-CCA-R3-CD, 2015 WL 9412860, at *8 (Tenn. Crim. App. Dec. 22, 2015).

In the present case, the sole reason stated on the record by the trial court for not permitting the Defendant to sit at counsel table was that the Defendant is not an attorney. In response to defense counsel's request that the Defendant be allowed to sit at counsel table, the trial court stated,

> No. He's not a lawyer, and I'm not going to allow that. I know he thinks he's a lawyer. But it took you years and years to get to where you are; and I don't want him running the show. You're the lawyer, and he's not; and so I'm not going to allow it.

-23-

We disagree with the reasoning employed by the trial court. In our view, the fact that the Defendant is not an attorney is immaterial to the question of whether he should be permitted to sit at counsel table. Additionally, the trial court's reasoning directly conflicts with this Court's statement in Rice that "it is the better practice to allow a defendant to sit at counsel table." 184 S.W.3d at 675. The instances are rare when the trial court should not allow the defendant to sit at counsel table, although "the course and conduct of trial proceedings rests within the sound discretion of the trial court." State v. King, 40 S.W.3d 442, 449 (Tenn. 2001) (citing State v. Cazes, 875 S.W.2d 253, 260 (Tenn. 1994)). The trial court did not make any findings on the record of any additional reasons why the Defendant should not have been allowed to sit at counsel table. Accordingly, we hold that the trial court erred in denying the Defendant's request to sit at counsel table.[8] See Davis, 466 S.W.3d at 61.

However, we must determine whether the trial court's error "more probably than not affected the judgment or would result in prejudice to the judicial process." Tenn. R. App. P. 36(b). The Defendant bears the burden of demonstrating the effect of the error in this case. See Rodriguez, 254 S.W.3d at 371-72 (stating that the defendant bears the burden of establishing the effect of a non-constitutional error). We conclude that the Defendant has failed to meet that burden.

As stated previously, the Defendant was seated behind his attorney during trial. Although the Defendant argues to the contrary, this seating arrangement did not impair his presumption of innocence. See Rice, 184 S.W.3d at 675 (holding that seating arrangement in which the defendant sat in row behind counsel table "did not impair the defendant's presumption of innocence"). Additionally, the seating arrangement did not interfere with the Defendant's ability to communicate with his attorney. The record indicates that the Defendant was able to tap on his attorney's shoulder when he needed to communicate. Although the Defendant contends that, if he were seated at counsel table, he would have been in a better position to tell his attorney to address issues that his attorney did not address and to make objections that his attorney did not make, he fails to specify any such issue or objection. Furthermore, the Defendant's assertion that "the fact that he was constantly tapping on trial counsel's shoulder more likely than not annoyed a large percentage of the members of the jury" is speculative and finds no support in the

---

[8] The State argues that "the trial court had legitimate concerns about the defendant's interfering with defense counsel's work. By the defendant's own admission, he would have engaged in highly disruptive and distracting behavior—such as instructing his attorney when to make legal objections—had he been permitted to sit at counsel table." The State has not pointed to any specific incidents of the Defendant's conduct in the record that supports this assertion. Moreover, the only reason cited specifically by the trial court for denying the Defendant's request to sit at counsel table was that the Defendant is not an attorney.

record.  Because the Defendant has failed to adequately demonstrate prejudice,  we hold that the trial court's error in denying his request to sit at counsel table was harmless.

*Jury Instruction on Flight*

In its charge to the jury, the trial court included the following instruction regarding flight:

> The flight of a person accused of a crime is a circumstance which, when considered with all the facts of the case, may justify an inference of guilt.
>
> Flight is a voluntary withdrawal of oneself for the purpose of evading arrest or a prosecution for the crime charged.  Whether the evidence presented proves, beyond reasonable doubt, that the defendant fled is a question for your determination.  The law makes no precise distinction as to the manner or method of flight.  It may be open or it may be hurried or a concealed departure, or it may be a concealment within the jurisdiction; however, it takes both the leaving the scene of the difficulty and a subsequent hiding out, evasion, or concealment in the community; or a leaving of the community for parts unknown to constitute flight.
>
> If flight is proved, the fact of flight alone does not allow you to find that the defendant is guilty of the crime charged; however, since flight by a defendant may be caused by a consciousness of guilt, you may consider the fact of flight, if flight is so proven, together with all the other evidence when you decide the guilt or innocence of the defendant.
> On the other hand, an entirely innocent person may take flight; and such flight may be explained by the proof offered by the facts and circumstances of the case.  Whether there was flight by the defendant, the reasons for it, and the weight to be given for it are questions for you to determine.

The Defendant contends that the trial court erred by not limiting this instruction to the aggravated assault charge.  The State argues that this issue is waived based on the same circumstances as the Defendant's alleged waiver of the counsel table issue.  As it did with the counsel table issue, the trial court heard the Defendant argue this issue at the hearing on the motion for new trial and ruled on its merits.  Therefore, for the same reasons that we rejected the State's waiver argument on the counsel table issue, we will consider this issue on its merits.

-25-

Challenges to jury instructions present mixed questions of law and fact; therefore, we review challenged instructions de novo without a presumption of correctness. State v. Rush, 50 S.W.3d 424, 427 (Tenn. 2001) (citing State v. Smiley, 38 S.W.3d 521, 524 (Tenn. 2001)).

"It is well-settled that a defendant has a constitutional right to a complete and correct charge of the law, so that each issue of fact raised by the evidence will be submitted to the jury on proper instructions." State v. Dorantes, 331 S.W.3d 370, 390 (Tenn. 2011) (citations omitted). The instruction must provide a "'clear and distinct exposition of the law'" in order to "satisf[y] a defendant's constitutional right to trial by jury." State v. Phipps, 883 S.W.2d 138, 150 (Tenn. Crim. App. 1994) (quoting State v. McAfee, 737 S.W.2d 304, 308 (Tenn. Crim. App. 1987)). Further, the instruction "must instruct the jury on those principles closely and openly connected with the facts before the court, and which are necessary for the jury's understanding of the case." State v. Elder, 982 S.W.2d 871, 876 (Tenn. Crim. App. 1998).

In determining whether a jury instruction is erroneous, this Court "review[s] the charge in its entirety and read[s] it as a whole." Rice, 184 S.W.3d at 683 (citing State v. Hodges, 944 S.W.2d 346, 352 (Tenn. 1997)). An instruction is "prejudicially erroneous" when "it fails to fairly submit the legal issues or if it misleads the jury as to the applicable law." State v. Vann, 976 S.W.2d 93, 101 (Tenn. 1998) (citing State v. Forbes, 918 S.W.2d 431, 447 (Tenn. Crim. App. 1995); Graham v. State, 547 S.W.2d 531 (Tenn. 1977)).

At the conclusion of the proof at trial, defense counsel raised the following objection regarding the jury instruction on flight, and the following colloquy occurred:

Defense: I would like to object to the instruction on Flight, Your Honor. We did not hear any testimony from the officers who testified that any of them told [the Defendant] that he was – that they wanted him – that he should stop.

State: Judge, Ms. Chrestman testified that she heard the vehicle pull up. She heard the squeal. She was inside the house; the defendant was outside the house. The defendant ran – the defendant's legs were cut by him going through brush – going over fences and so forth for many minutes while six – minimum – police officers were trying to apprehend the defendant.

The officers maintained a perimeter. They were on each side of the box, in essence, closing in, when they saw – when they caught the

-26-

defendant eventually. One of the officers said that he saw the defendant – he looked up and he saw the defendant twenty or twenty-five feet above him and that he saw the defendant leave that area and then come back when he was apprehended by two officers who took him down. I think it's pretty clear that there was flight.

Court: Also, you know, flight sometimes can be – like you can leave before anyone even finds out that you're wanted, you can flee. You can go to another state in hopes that no one can find you. Where does – where does it say that it had to be an officer ordering him to stop in the flight instruction?

State: Judge, it doesn't. It says whether the evidence presented proof, beyond reasonable doubt, that the defendant fled is a question for your determination. And then it goes on – flight takes both the leaving the scene of the difficulty – we've got that – and one of these things:

A subsequent hiding out.

Evasion or concealment.

Clearly there's evasion here – clearly there's evasion in an open field running for ten/twenty minutes. So, clearly those two elements are there – leaving the scene of the difficulty and evasion.

Court: All right. Well, I'll note your exception [sic], Mr. Rhea, but I feel flight is warranted here. It does show a consciousness of guilt, perhaps. I guess you could argue that he just felt like running and he likes to run and he was jogging through the neighborhood – I guess – or he likes to jump fences to see if he can do that. I don't know. But, according to that flight definition, it appears it's appropriate in this case.

. . . .

Defense: Doesn't – if we have this instruction on flight – we already have a charge on evading arrest; and if we have this added instruction on flight, it essentially leads to a directed verdict on the evading arrest charge.
Court: No. They still have to find that he – plus the – you – the flight is necessary on the first count of the indictment. It's proof – the flight is

proof, if the jury elects to believe it, of guilty knowledge for the charge to which the police were called there for.

So, granted some of the wording – or some of the thoughts behind flight . . . is mainly there for the first count of the indictment and not in the other two. If he was just charged with resisting official detention or evading arrest, then flight wouldn't be necessary; but it's more necessary for the first count of the indictment. It shows consciousness of guilt.

State: Your Honor, especially since the jury is going to be told that the jury can convict of each count or one count or two counts or they can acquit – they can do any combination of those things.
And, so, since each count is considered separately, flight needs to be in there.

Court: Okay. Yeah, I agree with that as well.

The jury instruction given by the trial court reflects the pattern instruction in effect at the time of trial. See 7 Tenn. Prac. Pattern Jury Instr. T.P.I.—Crim. 42.18 (16th ed. 2012). Since the trial of this case, this pattern jury instruction has been revised to indicate that, when a defendant is charged with multiple offenses including evading arrest, the first sentence of the flight instruction be, "The flight of a person accused of a crime *other than evading arrest* is a circumstance which . . . may justify an inference of guilt." 7 Tenn. Prac. Pattern Jury Instr. T.P.I.—Crim. 42.18 (19th ed. 2015) (emphasis added). The 2015 edition includes the following comment:

> Several unpublished cases have held that it is error to charge Flight when trying the offense of Evading Arrest, T.P.I. – Crim. 27.05 or Evading Arrest while Operating Motor Vehicle, T.P.I. – Crim. 27.05(b). If Evading Arrest is being charged along with other offenses for which the flight instruction is applicable, the bracketed language should be charged so that the jury will limit the applicability of the flight charge to the other offenses.

7 Tenn. Prac. Pattern Jury Instr. T.P.I.—Crim. 42.08, cmt. 1 (citing Smith, 2014 WL 3954062, at *13).

Although the trial court in this case did not have the benefit of the revised pattern instructions, the Defendant's attorney alerted the trial court to the issue. Indeed, in State v. Kelso, the Court of Criminal Appeals considered a pre-revision case in which "the trial court and the parties were in agreement" that the trial court would provide a modified

charge to reflect that the flight instruction should not be considered as to the evading arrest charge. No. E2000-01602-CCA-R3-CD, 2001 WL 681313, at *4-5 (Tenn. Crim. App. June 18, 2001). Nevertheless, the trial court neglected to give the modified charge. Id. at *4. On appeal, the Court of Criminal Appeals held that the challenged instruction did not entitle the defendant to relief because the Defendant's flight was not contested at trial. Id. at *5. In the present case, the Defendant's flight was contested by his attorney at closing argument, but the State's proof of his flight was overwhelming. Three officers testified at trial that they, along with other officers, were called to apprehend the Defendant on July 21, 2010, who was running from officers already at the scene. Officer Gross testified, "I saw a male white attempting to flee from surrounding officers that were telling him to stop and to come to him, at which point he still proceeded to the barrier at North Parkway trying to escape."

In State v. Staggs, the Court of Criminal Appeals determined that the trial court's failure to confine the flight instruction did not entitle the defendant to relief, noting that "the flight instruction was not given contemporaneously with the evading arrest instruction and was instead given with a group of instructions far removed from the instructions regarding the elements of the charged offenses." No. M2011-01675-CCA-R3-CD, 2013 WL 2722286, at *19 (Tenn. Crim. App. June 12, 2013), perm. app denied (Tenn. Apr. 10, 2015). Likewise, the trial court in this case provided the flight jury instruction far removed from the instructions pertaining to the elements of the indicted offenses.

We emphasize that the trial court instructed the jury that "flight alone does not allow you to find that the defendant is guilty of the crime charged" but rather that the jury may consider it "together with all the other evidence." Moreover, the State provided overwhelming evidence for the jury to convict the Defendant of evading arrest. Three officers testified about arriving at the scene of the incident and participating in the active apprehension of the Defendant, including: setting up a perimeter to prevent the Defendant's escape; chasing the Defendant through backyards; and sending the Defendant to the hospital upon apprehension because of his complaints of chest pains. Specifically, Officer Bishop testified that the Defendant "ran through some neighborhoods" and "went over a few fences." According to Officer Bishop, apprehending the Defendant required Officer Gerard to grab the Defendant and wrestle him to the ground.

Thus, given the language of the jury instruction, as well as the overwhelming proof to convict the Defendant for evading arrest, the failure to limit the flight instruction does not entitle the Defendant to relief.

Given our reversal of the aggravated assault conviction on the election of offenses issue, we decline to address in detail the issues regarding the impeachment of the Defendant with prior convictions, the trial court's denial of a mistrial based on testimony about a different criminal proceeding, and the admission of the victim's testimony about the Defendant's prior bad acts.[9] We conclude that the Defendant is not entitled to any additional relief on these issues.

## Conclusion

We hold that the State's failure to elect an offense as to the aggravated assault charge resulted in plain error. Accordingly, we reverse the Defendant's conviction for aggravated assault and remand the matter to the trial court for a new trial. The Defendant's conviction for evading arrest is affirmed. Costs of this appeal are assessed to the State of Tennessee.

_____
JEFFREY S. BIVINS, JUSTICE

---

[9] Moreover, the Defendant has not argued these issues separately with regard to the evading arrest conviction.