IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
February 3, 2026 Session

## STATE OF TENNESSEE v. JUSTIN JOHNSON-A/K/A STRAIGHT DROP

**Appeal from the Criminal Court for Shelby County**
**No. 22 04769        Jennifer Johnson Mitchell, Judge**

_____

### No. W2025-00127-CCA-R3-CD

_____

Defendant, Justin Johnson-a/k/a Straight Drop, appeals his convictions for conspiracy to commit first degree murder, first degree premeditated murder, and possession of a firearm by a convicted felon, for which he received an effective sentence of life imprisonment plus thirty-five years.  On appeal, Defendant challenges the sufficiency of the evidence supporting his convictions, the admission of photographs of the victim's body at the crime scene and during the autopsy, the trial court's denial of his request to sit at counsel table during trial, and the prosecutor's comments during closing arguments.  Defendant also contends that he is entitled to relief due to the cumulative effect of multiple errors.  Upon review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

MATTHEW J. WILSON, J., delivered the opinion of the court, in which KYLE A. HIXSON, and STEVEN W. SWORD, JJ., joined.

W. Price Rudolph, Memphis, Tennessee (on appeal), and Luke Evans, Murfreesboro, Tennessee (at trial), for the appellant, Justin Johnson-a/k/a/ Straight Drop.

Jonathan Skrmetti, Attorney General and Reporter; G. Kirby May, Assistant Attorney General; Steven J. Mulroy, District Attorney General; and Paul Hagerman and Iris Williams, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

The convictions in this case arose from the November 17, 2021 shooting death of the victim, Adolph Thornton, Jr., at a cookie shop in Memphis.  The victim, a rapper and owner of a record label called Paper Route Empire ("PRE"), had been involved in a rivalry with another record label called Cocaine Music Group ("CMG"), which was led by

Anthony "Big Jook" Mims, precipitated by the victim's refusal to sign a recording contract with CMG. In the months before the victim's death, Hernandez Govan, a "negotiator" in the rap business working with CMG, introduced Defendant, himself an aspiring rapper known as "Straight Drop," to Cornelius Smith. Big Jook had placed a $100,000 bounty on the victim, and Smith and Defendant agreed to kill the victim and split the proceeds with Govan. At approximately 12:21 p.m., Defendant and Smith shot and killed the victim, leading to the charges in this case.

## Factual and Procedural History

The Shelby County Grand Jury charged Defendant, Smith, Govan, and Defendant's brother, Jemarcus Johnson, with one count of conspiracy to commit first degree murder; Defendant, Smith, and Govan with first degree premeditated murder and the attempted first degree murder of the victim's brother, Marcus Thornton; and Defendant and Smith with employing a firearm during the commission of a dangerous felony, possessing a firearm as a convicted felon, and theft of property valued at $10,000 or more but less than $60,000. Defendant was tried separately from his co-defendants. Prior to trial, the State dismissed the counts of the indictment charging Defendant with attempted first degree murder, employing a firearm during the commission of a dangerous felony, and theft. In September 2024, Defendant's case proceeded to trial on charges of conspiracy to commit first degree murder, first degree premeditated murder, and possessing a firearm while being a convicted felon. At trial, the parties stipulated that Defendant was previously convicted on May 2, 2017, of a qualifying felony for purposes of Tennessee Code Annotated section 39-17-1307(b)(1).

*Preparations for the Shooting*

The evidence presented at trial established that the rivalry between the victim and Big Jook, who was deceased by the time of trial, escalated into physical violence. Raul Hopkins, a member of the victim's security team, testified that the victim turned down proposals to sign with CMG and that he made insulting comments in his music toward CMG and Big Jook. In 2015, someone shot at the victim's vehicle, and the victim blamed CMG. Someone affiliated with CMG also shot the victim during a separate incident in California. Defendant was not involved in either of the prior shootings.

Smith testified that Govan, who lived on Bradley Street in Orange Mound and sold ecstasy to Smith, introduced him to Defendant. Smith described Govan as a "negotiator" in the rap business and said that he believed that Govan was attempting to negotiate a deal between Defendant and CMG. Smith met with Govan on one occasion during which Govan informed him that Big Jook had placed a "hit on [the victim's] head" for $100,000. Smith and Govan met with Big Jook on another occasion during which Govan discussed the prices that different artists had on their "heads," and Big Jook agreed with him.

- 2 -

Defendant was not present for either of the two meetings. Smith stated that Govan "put" Smith and Defendant "together" between these two meetings. Smith said that he and Defendant agreed to kill the victim and that they discussed their plans several weeks prior to the shooting. The men agreed that Defendant and Smith would each receive $40,000 and that Govan would receive $20,000 of the bounty. Smith said they knew the victim would be involved in a turkey drive in the area during the week before Thanksgiving.

The State presented evidence that Defendant procured a white Mercedes-Benz car during the early morning hours of November 17, 2021, prior to the shooting. According to Defendant's cell phone records, on November 16, 2021, Treon Ingram sent a photograph of a white Mercedes car via text message to Defendant's cell phone. Khistan Garner testified that he went with Mr. Ingram to a neighbor's house in a white Mercedes car and that "Straight Drop" arrived in a white Ford Expedition. The three men then left the neighbor's house and went to a Valero gas station located near the University of Memphis, arriving sometime between 2:00 and 3:00 a.m. Mr. Garner was driving the white Mercedes car, and Mr. Ingram was driving an Infiniti in which "Defendant" was a passenger. While at the gas station, Defendant and Mr. Garner switched vehicles, with Defendant leaving in the white Mercedes.

Surveillance video at Crosstown Concourse where Defendant lived depicted a white Ford Expedition entering the parking garage at 7:15 p.m. on November 20, 2021, the day before the shooting. Shortly thereafter, a man wearing a black hoodie, gray sweatpants, black shoes with white soles, and a Bass Pro Shop cap walked into the building, entered an elevator, and exited on the eighth floor, where Defendant's apartment was located. At some point, the same man left the apartment building and returned at 11:13 p.m. that same day. Call detail records for Defendant's cell phone showed that between 1:00 and 2:35 a.m., twelve different outgoing and incoming calls from Defendant's cell phone accessed a tower that provided coverage for the Crosstown area. At 2:41 a.m. on the following morning, a man wearing the same clothing without the cap entered the elevator on the eighth floor, exited the lobby, and walked into the parking garage toward a white vehicle. Shortly thereafter, a white Ford Expedition exited the garage.

At 2:58 a.m., Defendant's cell phone sent a "location drop" to Mr. Ingram's cell phone of an address on Bradley Street next to the driveway where the white Mercedes car involved in the shooting was later recovered. Surveillance video from the Valero gas station on the morning of the shooting showed a white Mercedes and a white Infiniti enter the parking lot and park at the gas pumps at 3:16 a.m., less than twenty minutes after the "location drop" was sent. Retired Memphis Police Department ("MPD") Investigator Terence Dabney identified Mr. Garner as the driver of the white Mercedes who exited the car and entered the Infiniti. The investigator noted that an individual exited the Infiniti and entered the Mercedes, but he said that it was "impossible" to determine whether that

individual was Defendant from the video. However, according to the call detail records from Defendant's cell phone, at 3:17 a.m., an outgoing call from his cell phone accessed a cell tower that provided coverage for the area where the Valero gas station was located. Both cars then left the gas station.

Surveillance footage from Crosstown Concourse from the day of the shooting showed a white Mercedes car with damage on the passenger side entering the garage at 4:48 a.m., and at 4:49 a.m., an outgoing call from Defendant's cell phone accessed a tower located just south of Crosstown Concourse. Investigator Dabney identified the car in the surveillance video as the same car that was at the scene of the shooting and later recovered by officers on Bradley Street. A man wearing the same clothing as the man depicted in earlier surveillance footage from Crosstown Concourse was shown walking into the apartment building with a small child, entering the elevator, and exiting on the eighth floor.

*The Shooting*

Surveillance footage from Crosstown Concourse showed that at approximately 10:51 a.m. on the day of the shooting, a man wearing a black hoodie, gray sweatpants, black shoes with white soles, and a black Bass Pro Shop cap, accompanied by a small child, entered the elevator on the eighth floor, exited the apartment building, and walked into the parking garage.[1] A white Mercedes exited the garage shortly thereafter. Investigator Dabney identified a photograph of the man while in the elevator and noted that the man had the same distinctive tattoo on his hand as Defendant. The investigator stated that the cookie shop where the shooting occurred was located ten to fifteen minutes away from Crosstown Concourse.

Smith testified that Defendant picked him up at his father's house located near Lamar Avenue and Semmes Street in the Orange Mound area of Memphis. Defendant called Smith twice prior to Defendant's arrival; Smith answered one of the calls; and records from the cell phones of Defendant and Smith confirm the two calls. Defendant was driving a white Mercedes-Benz that Smith had not seen previously. When he got into the passenger's side of the car, Smith saw a handgun and a "Draco," a larger semiautomatic rifle, in the backseat. Defendant was wearing gloves, and Smith brought gloves with him. Smith wore gray sweatpants, a blue Gap hoodie, and orange and white "Jordan 1s" tennis shoes while Defendant wore a cap with a Bass Pro Shop logo, gray sweatpants, and a black hoodie.

---

[1] The State originally presented evidence that the recording reflected that this event occurred at approximately 11:51 a.m., but MPD Lieutenant Ma-haji Abdul-Baaqee, who obtained the footage and prepared the reels and timeline, subsequently testified that he made a mistake in preparing the reels and that the surveillance footage showed that the event occurred one hour earlier.

- 4 -

Smith testified that Defendant drove to a home on Bradley Street located across from Govan's home where a white Ford Expedition was parked in the yard, and the call detail records from Smith's cell phone showed that at 12:51 p.m., his cell phone accessed a cell tower that provided coverage for the Orange Mound area and Bradley Street. Defendant retrieved an unknown item from the Expedition, returned to the Mercedes, and drove down several streets. Defendant and Smith eventually saw the victim's vehicle and followed him to the cookie shop. Defendant drove around the block and pulled into the parking lot. Smith jumped out of the vehicle and shot at the victim with the semiautomatic rifle while the victim stood by a window inside the cookie shop. Defendant exited the vehicle and shot at the victim with a handgun. Smith did not know how many times he fired his weapon. The men got back into the Mercedes, and Defendant drove away from the scene. The victim's brother, Marcus Thornton, shot at them as they were leaving, striking Smith in the upper arm and leg and grazing Defendant's back.

Surveillance footage from the interior and exterior of the cookie shop showed that at approximately 12:21 p.m., the victim's Chevrolet Corvette pulled into the parking lot, and the victim and Mr. Thornton got out and entered the shop. The victim placed his order at the counter and then stood by the window facing the parking lot. Meanwhile, a white Mercedes with damage on the passenger's side pulled into the parking lot, and the passenger, whom Smith had previously identified as himself, immediately exited the car wearing a face mask, a blue hoodie, gray sweatpants, and gloves and holding a rifle. Smith stood outside the store while shooting the rifle toward the store. The driver, whom Smith identified as Defendant, exited the car holding a handgun and wearing a black cap with what appeared to be a Bass Pro Shop logo, a black hoodie, gray sweatpants, and dark shoes with white soles. The driver also stood outside the store and fired toward the store. Surveillance footage from the interior of the store showed bullets coming through the window and striking the victim. The victim then fell out of view of the video camera. While inside the store, Mr. Thornton returned fire with a handgun. He then ran outside, retrieved a rifle from the Corvette, and shot at the fleeing Mercedes.

According to the call detail records from Defendant's cell phone, calls placed at 12:06 and 12:09 p.m. from Defendant's cell phone accessed two towers located slightly east of the scene of the shooting. At 12:17 p.m., an outgoing call from Defendant's cell phone accessed a tower located just north of the crime scene. At 12:22:40 p.m., Defendant's cell phone had a data session that accessed a tower providing coverage for the scene of the shooting. At 12:23:05 p.m., an incoming call to Defendant's cell phone that went to voicemail accessed a tower located just north of the crime scene. Tennessee Bureau of Investigation Special Agent and former MPD digital forensics examiner Michael Garner testified that he did not know whether the area of this tower's coverage extended to the crime scene and that the use of the two different towers could indicate, but did not necessarily mean, that the cell phone had been moved. Defendant's cell phone accessed a

cell tower located at I-240 west of the cookie shop during a call at 12:23:06 p.m. and a tower located more than three miles from the cookie shop that occurred at 12:23:09 p.m. Thus, Investigator Garner agreed that within one minute, the cell phone utilized four different towers located miles away from each other.

Investigator Dabney testified that officers recovered .40 caliber casings consistent with the driver's handgun and 7.62 millimeter caliber casings consistent with Smith's rifle from outside the store's window. Officers located 9 millimeter caliber casings consistent with Mr. Thornton's handgun inside the store. Officers located .223 caliber casings consistent with Mr. Thornton's semiautomatic weapon closer to the roadway. Officers never located the handgun or the rifle used to shoot the victim.

Dr. Juliette Scantlebury, an assistant medical examiner at West Tennessee Regional Forensic Center and an expert in forensic pathology, performed the autopsy on the victim. She testified that the cause of the victim's death was multiple gunshot wounds to his head, torso, and neck and that the manner of his death was homicide. She stated that there were a total of twenty entry wounds and four exit wounds in the victim's body.

*The Shooters' Flight and Subsequent Arrest*

Smith testified that following the shooting, he and Defendant returned to Bradley Street, where Smith moved the Expedition and Defendant parked the Mercedes in the yard where the Expedition had been. Smith and Defendant left in the Expedition after the guns were moved from the Mercedes. Smith inadvertently left his cell phone in the glove compartment of the Mercedes. The call detail records from Smith's cell phone showed that calls to his cell phone between 1:00 p.m. and 1:47 p.m. went straight to voicemail, which was consistent with his leaving his cell phone behind. During those calls, his cell phone accessed a cell tower that provided coverage for Orange Mound and Bradley Street.

Smith testified that Defendant contacted Big Jook through FaceTime to inform him "that was our work." Defendant used "jailhouse sign language" to spell out "Dolph," and Big Jook stated that he was with his children and would contact them later. Smith's testimony was supported by Defendant's cell phone records showing that at 12:25:40 p.m., an outgoing call was placed from Defendant's cell phone to Big Jook's cell phone that did not appear to have been answered. At 12:25:50 p.m., a FaceTime audio call was placed from Defendant's cell phone to Big Jook's cell phone, but the actual FaceTime communication and the call log subsequently were deleted from Defendant's cell phone.

Smith testified that Defendant contacted a cousin, Keona Hopper, and arranged for them to go to her home to clean up and change clothes. Defendant's cell phone records showed that between 12:39 and 12:40 p.m., two outgoing calls were placed from his cell phone to Ms. Hopper's cell phone, and a text message with Ms. Hopper's address was sent

from Ms. Hopper's cell phone to Defendant's cell phone. Smith said Defendant also called "one of his partners" to bring a "wound kit" to treat their gunshot wounds. At 12:47 p.m., two text messages were sent from Defendant's cell phone to Jermaine Sears's cell phone, one listing Ms. Hopper's address and another stating, "Now, bro, I need you now." Mr. Sears responded via text message that he was on his way.

Smith testified that he and Defendant arrived at Ms. Hopper's apartment wearing the same clothes that they had been wearing during the shooting. They changed clothes, and Defendant went outside and returned with a wound kit, which Defendant used to bandage his shoulder. Smith sent a text message to his girlfriend with Defendant's cell phone asking her to come get him. Smith's girlfriend arrived in a 2020 Chevrolet Trax, and they left to pick up his cell phone from Govan with Defendant to get their money from Big Jook. Smith did not know whether Defendant actually met with Big Jook or what happened to the guns that they used to shoot the victim.

Twenty-six different calls to and from Defendant's cell phone between 12:58 p.m. and 1:57 p.m. accessed a tower in South Memphis that provided coverage for Tulane Apartments. Surveillance footage from the apartment complex showed a white Ford Expedition entering the parking lot at about 1:00 p.m., approximately thirty-seven minutes after the shooting. Ms. Hopper walked toward the Expedition, and two men wearing clothing that matched the clothing worn by the shooters exited the Expedition. At trial, Smith identified himself as exiting the driver's side of the Expedition and Defendant as exiting the passenger's side. The two men and Ms. Hopper then entered an apartment.

At approximately 1:17 p.m., a Dodge Charger entered the parking lot of the apartment complex. Prior to its arrival, a photograph of the Dodge Charger was sent via text message from Mr. Sears's cell phone to Defendant's cell phone. Surveillance footage showed a man whom Smith identified as Defendant exiting Ms. Hopper's apartment, retrieving two bags and a yellow hoodie from the Charger, and reentering the apartment. Smith said one of the bags contained a wound kit that he used in tending to the bullet wound to his shoulder.

Beginning at 1:26 p.m., Defendant's cell phone made two outgoing calls and sent one text message listing Ms. Hopper's address to a cell phone belonging to Smith's girlfriend. Surveillance footage from the apartment complex showed that at approximately 1:56 p.m., a small Chevrolet SUV, which Smith identified as his girlfriend's Chevrolet Trax, entered the parking lot. Ms. Hopper, a man in a black hoodie, and a man in a yellow hoodie exited the apartment. Smith identified himself as the man in the black hoodie and Defendant as the man in the yellow hoodie. The man in the black hoodie left in the Chevrolet SUV, and the man in the yellow hoodie left in the white Ford Expedition.

Surveillance footage from Crosstown Concourse showed a silver or white car parking in the outside parking lot at approximately 7:51 p.m. A man wearing a yellow hoodie then entered the apartment building and an elevator. The footage did not show the floor on which the man exited the elevator. At 8:17 p.m., a man wearing a yellow hoodie and holding a suitcase and a bag entered the elevator on the eighth floor, exited the elevator in the lobby, walked out of the building, and left in a silver or white car.

Smith testified that at some point, Govan called Defendant and told them to move the Mercedes, and Smith arranged for Govan to retrieve Smith's cell phone from the Mercedes and meet him at a car wash later. Smith said that after he retrieved his cell phone from Govan, Smith and Govan met again at Smith's father's house, where Govan gave Smith money to purchase pills. Defendant subsequently moved the Mercedes to the backyard of the house where it had been parked. Govan gave Smith money to purchase a cover for the car. Smith cleaned the Mercedes using peroxide and bleach but denied that he and Defendant were bleeding heavily while inside the car following the shooting.

Three days after the shooting, officers recovered a white Mercedes with damage to the passenger's side behind an abandoned home on Bradley Street across the street from Govan's home and approximately two miles away from the scene. Officers learned that the car had been taken in a carjacking in Memphis a few weeks before the shooting in which Mr. Ingram was the suspect. Officers transported the car to the MPD's crime scene tunnel where the car was processed for fingerprints. Fingerprints lifted from the right rear quarter panel of the car belonged to Smith; fingerprints lifted from the outer portion of the driver's side door, the lid of the trunk, and the Mississippi license plate belonged to Mr. Garner; and fingerprints lifted from the left rear quarter panel and a bank brochure found in the car belonged to Mr. Ingram. Officers did not locate any DNA, blood, or fluid evidence inside the car but learned that the car may have been cleaned before it was impounded.

Smith testified that he contacted Defendant requesting money, but Defendant stated that Big Jook had said it was "too hot right now, he gonna get with us and all that." Smith did not have Big Jook's contact information. Smith continued to text Defendant but later learned that Defendant had given his cell phone to Johnson following the shooting. Smith and his girlfriend fled to Atlanta after police officers found the Mercedes but returned to Memphis after a few days when they ran out of money. During their return, Smith had a three-way call with Defendant, who stated that he had a package for Smith, and Smith instructed him to give the package to Smith's neighbor. The "package" was $500 and a letter stating that "Jook said that if we get caught up, he gonna make sure we had the best lawyers and all that other stuff." A few days later, Defendant stated that more money would be delivered to Smith, who believed he would be receiving $20,000 to $30,000. Instead, someone wearing a facemask gave Smith's girlfriend $300. Govan later assured

Smith that he would be paid, but Smith was arrested one or two days later without having received any other payments. Smith acknowledged that the fee for his original attorney was paid by CMG and that the money paid was "basically" for his role in killing the victim. He did not have direct knowledge of Defendant receiving any money for the killing.

Smith acknowledged that he was not truthful with officers when they interviewed him following his arrest. He said he later "came to [his] senses" and decided to tell officers the truth. He decided to cooperate after he received a letter written by Defendant asking him to "cut him loose" and implicate Big Jook and Govan in the offenses.

Co-defendant Jermarcus Johnson, Defendant's brother, testified that he was arrested in connection with the shooting and that he pleaded guilty to being an accessory after the fact as a result of his taking control of the car that Defendant was driving after the shooting, taking control of Defendant's cell phone, and assisting Defendant by using Defendant's cell phone to communicate with Smith. Johnson had not yet been sentenced at by the time of Defendant's trial, and he acknowledged that he had been informed by the prosecutor that he could receive a more favorable sentence by testifying truthfully.

Johnson testified that in 2021, he was in communication with Defendant approximately every other week and saw him on two or three occasions during the year. After the shooting, Defendant informed Johnson that he would be bringing a rental vehicle to him. Johnson said he had not requested a vehicle from Defendant, but Defendant was aware that Johnson did not have a vehicle. Defendant arrived in a Chrysler 200 or Chrysler 300, and other people followed Defendant in a large white SUV.

Johnson testified that he entered the Chrysler with Defendant, who was transferring numbers from one cell phone to another cell phone. Defendant said he was giving Johnson one of the cell phones to post photographs and videos on Defendant's social media accounts and to check his emails. Johnson did not ask Defendant why he wanted Johnson to post photographs and videos. Defendant did not state that he was leaving town or needed to "lay low." Defendant received a call on his other cell phone, exited the Chrysler, and left in the white SUV.

Johnson stated that he notified Defendant through text message whenever someone attempted to contact Defendant on the cell phone. Johnson recalled occasions during which he set up a three-way call between Defendant and someone else, including someone identified as "C girl," whom Johnson later learned was Smith. Johnson received text messages from Smith on Defendant's cell phone in which Smith asked about money. Officers subsequently came to Johnson's apartment and retrieved Defendant's cell phone.

Defendant was eventually arrested in Indiana. MPD Investigator Jesse Browning testified that Defendant, Smith, and Govan were charged in connection with the shooting but that Big Jook was not charged because he died sometime following the shooting. Investigator Browning said that he met with Govan and his counsel on two occasions during which Govan provided information about the case and that Govan had a proffer agreement with the State.

At the conclusion of the State's proof, Defendant elected not to testify and did not present any additional proof. The jury convicted Defendant of conspiracy to commit first degree premeditated murder, first degree premeditated murder, and possession of a firearm as a convicted felon. Following a sentencing hearing, the trial court imposed an effective sentence of life imprisonment plus thirty-five years. Defendant filed a timely but unsuccessful motion for new trial. He then filed a timely notice of appeal.

**Analysis**

On appeal, Defendant challenges the sufficiency of the evidence supporting his convictions, the admission of a photograph of the victim's body at the crime scene, the admission of autopsy photographs, the trial court's denial of his request to sit at counsel table during trial, and the prosecutor's comments during closing arguments. Defendant also contends that he is entitled to relief due to the cumulative effect of multiple errors.

I. Sufficiency of the Evidence

Defendant asserts that the evidence was insufficient to support his conspiracy conviction because the proof did not establish that he had an agreement with another person to commit first degree murder. He maintains that Smith's testimony was not credible in challenging his conviction for first degree murder and that the proof failed to establish that he possessed a firearm in challenging his firearm conviction. The State responds that the evidence, when viewed in the light most favorable to the State, was sufficient to support Defendant's convictions.[2] We agree with the State.

---

[2] We note that the State addresses Defendant's arguments regarding the sufficiency of the evidence by applying the common law accomplice-corroboration rules, which our supreme court abrogated in *State v. Thomas*, 687 S.W.3d 223, 242 (Tenn. 2024). Our supreme court abolished the rule on a prospective basis, concluding "that change shall be applied to all trials commencing after the date of the mandate." *Id.* at 245. This court recently recognized that based on this language, the new law applies to trials commencing after March 7, 2024, the date of the mandate. *State v. Slayter*, No. M2024-01280-CCA-R9-CO, 2025 WL 688920, at *5-6 (Tenn. Crim. App. Mar. 3, 2025), *no perm. app. filed*. Defendant's trial commenced in September 2024. Accordingly, the common law accomplice-corroboration rules do not apply. We further note that the trial court did not instruct the jury on the common law accomplice-corroboration rule but

We review a challenge to the sufficiency of the convicting evidence to determine whether, "after viewing the evidence in the light most favorable to the prosecution" and providing the State with "the strongest legitimate view of the evidence as well as all reasonable and legitimate inferences which may be drawn therefrom," "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (citations omitted); *State v. Davis*, 354 S.W.3d 718, 729 (Tenn. 2011) (citations omitted); Tenn. R. App. P. 13. Our review "is identical whether the conviction is predicated on direct or circumstantial evidence, or a combination of both." *State v. Williams*, 558 S.W.3d 633, 638 (Tenn. 2018) (citing *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011)). Importantly, a guilty verdict removes the presumption of innocence and replaces it with one of guilt on appeal, shifting the burden to the defendant to demonstrate why the evidence is legally insufficient to support the conviction. *Davis*, 354 S.W.3d at 729 (citing *State v. Sisk*, 343 S.W.3d 60, 65 (Tenn. 2011)).

We must decline any invitation to revisit witness credibility or any purported discrepancies in the evidence because the jury, not this court, resolves all questions involving the credibility of the witnesses, the weight and value to be given to evidence, and the factual disputes raised by such evidence. *See Dorantes*, 331 S.W.3d at 379 (citing *State v. Campbell*, 245 S.W.3d 331, 335 (Tenn. 2008)). Accordingly, this court will neither reweigh nor reconsider the evidence when evaluating the sufficiency of the convicting proof. *State v. Stephens*, 521 S.W.3d 718, 724 (Tenn. 2017).

As charged in this case, "[f]irst degree murder is . . . [a] premeditated and intentional killing of another." Tenn. Code Ann. § 39-13-202(a)(1). A person acts intentionally for purposes of Code section 39-13-202(a)(1) "when it is the person's conscious objective or desire to cause the death of the alleged victim." *State v. Reynolds*, 635 S.W.3d 893, 915 (Tenn. 2021) (citing Tenn. Code Ann. § 39-11-302(a) (2018)). As used in the statute, "[p]remeditation 'is an act done after the exercise of reflection and judgment.'" Tenn. Code Ann. § 39-13-202(e). Although "'[p]remeditation' means that the intent to kill must have been formed prior to the act itself," the State need not establish "that the purpose to kill preexist[ed] in the mind of the accused for any definite period of time." *Id.*

Whether premeditation exists is a question of fact for the jury "which may be established by proof of the circumstances surrounding the killing." *State v. Young*, 196 S.W.3d 85, 108 (Tenn. 2006); *see also Reynolds*, 635 S.W.3d at 916. The Tennessee Supreme Court has identified a non-exhaustive list of specific circumstances that suggest the existence of premeditation:

---

instructed the jury in accordance with the new jury instruction about accomplice testimony promulgated by our supreme court in *Thomas*. *See Thomas*, 687 S.W.3d at 248.

(1) The use of a deadly weapon on an unarmed victim;

(2) The particular cruelty of the killing;

(3) Threats or declarations of the intent to kill;

(4) The procurement of a weapon;

(5) Any preparations to conceal the crime undertaken before the crime was committed;

(6) The destruction or secretion of evidence of the killing;

(7) Calmness after the killing;

(8) Evidence of motive;

(9) The use of multiple weapons in succession;

(10) The infliction of multiple wounds or repeated blows;

(11) Evidence that the victim was retreating or attempting to escape when killed;

(12) The lack of provocation on the part of the victim; and

(13) The failure to render aid to the victim.

*Reynolds*, 635 S.W.3d at 916-17 (citations omitted). The jury, as the trier of fact, "is not limited to any specific evidence when determining whether a defendant intentionally killed the victim 'after the exercise of reflection and judgment.'" *State v. Davidson*, 121 S.W.3d 600, 615 (Tenn. 2003) (quoting Tenn. Code Ann. § 39-13-202(d) (current version at Tenn. Code Ann. § 39-13-202(e))). Thus, premeditation "may be established by any evidence from which a rational trier of fact may infer that the killing was done 'after the exercise of reflection and judgment.'" *State v. Leach*, 148 S.W.3d 42, 53 (Tenn. 2004) (quoting Tenn. Code Ann. § 39-13-202(d) (current version at Tenn. Code Ann. § 39-13-202(e))).

A conspiracy is committed when

two (2) or more people, each having the culpable mental state required for the offense that is the object of the conspiracy, and each acting for the purpose of promoting or facilitating commission of an offense, agree that one (1) or more of them will engage in conduct that constitutes the offense.

- 12 -

Tenn. Code Ann. § 39-12-103(a). A defendant may not be convicted of conspiracy to commit an offense "unless an overt act in pursuance of the conspiracy is alleged and proved to have been done by the person or by another with whom the person conspired." *Id.* § 39-12-103(d). Furthermore,

> [c]onspiracy is a continuing course of conduct that terminates when the objectives of the conspiracy are completed or the agreement that they be completed is abandoned by the person and by those with whom the person conspired. The objectives of the conspiracy include, but are not limited to, escape from the crime, distribution of the proceeds of the crime, and measures, other than silence, for concealing the crime or obstructing justice in relation to it.

*Id.* § 39-12-103(e)(1). The essential feature of the offense of conspiracy is the "agreement to accomplish a criminal or unlawful act." *State v. Pike*, 978 S.W.2d 904, 915 (Tenn. 1998). To prove a conspiracy, however, the State is not required to show a formal agreement between the parties to commit the unlawful act, which, in this case, was first degree premeditated murder. *See id*; *State v. Shropshire*, 874 S.W.2d 634, 641 (Tenn. Crim. App. 1993). "[A] mutual implied understanding is sufficient, although not manifested by any formal words, or a written agreement." *State v. Gaylor*, 862 S.W.2d 546, 553 (Tenn. Crim. App. 1992); *see Randolph v. State*, 570 S.W.2d 869, 871 (Tenn. Crim. App. 1978). The agreement "may be proven by circumstantial evidence." *Pike*, 978 S.W.2d at 915.

Finally, "[a] person commits an offense who unlawfully possesses a firearm" and "[h]as been convicted of a felony crime of violence." Tenn. Code Ann. § 39-17-1307(b)(1)(A) (2021). At trial, the parties stipulated that for the purposes of the firearm count, Defendant was convicted on May 2, 2017, of a qualifying felony for purposes of Tennessee Code Annotated section 39-17-1307(b)(1).

According to the evidence presented at trial, the victim was involved in a rivalry with those associated with CMG, including Big Jook, who placed a "hit on [the victim's] head" for $100,000. Smith met with Govan to discuss the bounty, and both men met with Big Jook once to discuss the bounty for the victim and other artists on the victim's record label. Although Defendant did not attend these meetings, Smith testified that between the two meetings, Govan "put" Smith and Defendant "together," that Smith and Defendant agreed to kill the victim, and that they discussed their plans for several weeks prior to the shooting. Smith testified that the men agreed that he and Defendant would each receive $40,000 and that Govan would receive $20,000 for killing the victim.

Prior to the shooting, Defendant secured a stolen white Mercedes to drive to the scene of the shooting. Shortly before the shooting, Defendant left his apartment in a black

hoodie, gray sweatpants, black shoes with white soles, and a black Bass Pro cap, and surveillance footage showed a white Mercedes leaving the garage of the apartment complex shortly after Defendant left the building. Digital forensic evidence established that Defendant called Smith twice just before the shooting and later placed Defendant's cell phone near a cell tower that provided coverage to the area of the cookie shop.

When Defendant picked up Smith, he was driving a white Mercedes, and a handgun and a semiautomatic rifle were in the backseat. Smith testified that he and Defendant saw the victim's vehicle and followed him to the cookie shop. Defendant exited the driver's side of the white Mercedes wearing a black hoodie, gray sweatpants, black shoes with white soles, and a black Bass Pro cap and began firing a handgun while Smith exited the passenger's side and began shooting the semiautomatic rifle at the victim. The two fled the scene in the Mercedes as the victim's brother returned fire. Surveillance video confirmed Smith's account and his description of Defendant's clothing.

Defendant contacted Big Jook following the shooting, and Smith testified that Defendant informed Big Jook of their shooting the victim. Defendant and Smith then went to a home on Bradley Street where they parked the white Mercedes and left in a white Ford Expedition, and officers later recovered the Mercedes from the home. Defendant called Ms. Hopper, who sent her address to Defendant via text message, and the two men went to Ms. Hopper's apartment in the Expedition. There, they changed clothes and Smith tended to his gunshot wound after Defendant arranged for someone to deliver a "wound kit." Smith's testimony was supported by surveillance video from Ms. Hopper's apartment complex and the location data and extraction information from Defendant's cell phone. Defendant changed into a yellow hoodie and left the apartment in the Expedition.

Defendant obtained a second cell phone, gave his old cell phone to Johnson, and arranged for Johnson to use the cell phone to post on Defendant's social media pages, communicate with others via text message on Defendant's behalf, and arrange three-way calls between Defendant and others, including Smith. Defendant arranged to provide Smith with cash as partial payment for the shooting. Defendant fled and was later arrested in another state. While incarcerated, he wrote a letter to Smith urging him to implicate himself, Govan, and Big Jook in the shooting but to maintain that Defendant was not involved.

We must decline Defendant's challenge to Smith's credibility because the jury, and not this court, determines the credibility of the witnesses as the trier of fact. *See Dorantes*, 331 S.W.3d at 379. We conclude that the evidence, when viewed in the light most favorable to the State, established that Defendant agreed with Smith and others to commit first degree premeditated murder of the victim, that he and Smith premeditated the victim's murder and intentionally carried it out, and that Defendant possessed a firearm after having

been convicted of a violent felony offense. Thus, the evidence is sufficient to support Defendant's convictions.

## II. Admission of Photographs

Defendant contends that the trial court erred in admitting photographs of the victim's body at the crime scene and from the autopsy. He argues that the cause of the victim's injuries and death were not in dispute, that the testimony of witnesses and the video recording of the shooting were sufficient to establish the victim's injuries, and that, therefore, the probative value of the photographs was "miniscule." He also argues that the photographs were unfairly prejudicial in that they were "gruesome" and used to inflame the jury. The State responds that the trial court properly exercised its discretion in admitting the photographs. We agree with the State.

### A. Trial Proceedings

Prior to trial, Defendant moved to exclude all postmortem photographs of the victim, asserting that the photographs were not relevant to any disputed issue at trial and that they were unfairly prejudicial due to their graphic and gruesome nature. At trial, however, Defendant announced that he only objected to the admission of two autopsy photographs and one photograph from the crime scene. One autopsy photograph ("Exhibit A") was a frontal view of the victim's face and a portion of his shoulders that showed a side view of a bullet wound to his jaw, wounds on his shoulder, scratches on his face, and blood in his mouth. The second autopsy photograph ("Exhibit 16") was a close-up view of the bullet wound to the victim's jaw and a ruler showing the size of the wound. The crime scene photograph ("Exhibit 35") depicted the front of the victim's body from the waist upward lying on the floor with his shirt raised and medical leads on his body. Blood was on his face, neck, hands, and shirt. On the floor next to him were multiple evidence markers, broken glass, and a large pool of blood.

Defendant objected to the admission of the two autopsy photographs pursuant to Tennessee Rule of Evidence 403, arguing that the photographs were unfairly prejudicial based upon their gruesome nature. He also argued that other evidence would be presented to adequately describe the victim's injuries, including the medical examiner's testimony, report, and diagram. Regarding Exhibit A, he maintained that "there's no probative value for showing just the image of [the victim's] face." The State responded that it had the burden of proving the cause and manner of the victim's death and that the photographs would aid the medical examiner in describing the victim's injuries. The State noted that it had reviewed all the autopsy photographs and had confined its presentation to the least gruesome photographs available.

The trial court reviewed the standard for exclusion of evidence set forth in Rule 403, recognizing that it must determine whether the probative value of the photographs was substantially outweighed by the danger of unfair prejudice. The court agreed with Defendant that Exhibit A had little probative value and found that Exhibit A was "kind of duplicative" and that its probative value was substantially outweighed by the danger of unfair prejudice. The photograph was entered for identification purposes. The court confirmed with the State that Exhibit 16 was the least gruesome photograph available "that actually shows the wound itself" and found that the photograph "will give the jury indication of the wound itself."

The State entered Exhibit 16 at trial through the testimony of Dr. Scantlebury. She testified that the photograph showed a gunshot wound to the victim's right jaw, that the bullet or bullets struck the skeletal muscle and caused many fractures to the lower jaw and the gum where the teeth are located, and that the wound was potentially fatal.

The crime scene photographs were admitted through Investigator Dabney's testimony. Defendant objected to the admission of one of the photographs, Exhibit 35, pursuant to Rule 403 and argued that the photograph lacked any probative value and was unfairly prejudicial. Defendant argued that the photograph was taken after the victim had received medical intervention by emergency medical personnel and that the photograph, therefore, did not accurately reflect the position of the victim's body following the shooting. He also argued that Exhibit 35 was cumulative to evidence of the location of the victim's injuries that had previously been presented at trial through the medical examiner's testimony.

The State responded that it had the burden of establishing that the victim was murdered, that the surveillance video of the shooting only showed a small portion of the victim's body after he was shot, and that Exhibit 35 was the only photograph of the victim's body at the scene that the State intended to introduce. The State noted that the area of the store where the victim was shot was not adequately reflected in the surveillance video and argued that the photograph, when viewed in relation to other crime scene photographs depicting other evidence such as bullet holes and shell casings, would reflect the area of the store where the victim was shot. The State argued that the photograph was "evidence of violence, I understand that. But this is a violent case."

The trial court recognized that no evidence had been presented to establish the extent to which the victim's body was manipulated or moved during medical intervention by emergency personnel. The court overruled Defendant's objection stating,

> I'm gonna allow the State to put this evidence in. This is the only one that's gonna show his face; correct? And because it's near the window, we know that's where he was shot near some part of the window. And we have no

other proof of where or what happened. But based on 403, I'm gonna overrule your motion and deny your motion.

The court found that the probative value of the photograph was not substantially outweighed by its prejudicial effect.

Investigator Dabney testified Exhibit 35 depicted the victim's body in the position in which he lay when Investigator Dabney arrived at the scene. He noted that when he arrived, the attempts to resuscitate the victim had ceased, and he acknowledged that the photograph depicted evidence of medical intervention, including leads on the victim's body. Investigator Dabney identified other photographs of bullet holes, shattered glass, and other evidence collected from the crime scene and used the photographs in conjunction with Exhibit 35 to show where the evidence was in relation to the area where the victim's body was found.

### B. The Admission of Photographic Evidence

"The admissibility of photographic evidence lies within the sound discretion of the trial court, and its ruling on admissibility will not be disturbed on appeal absent a showing of an abuse of that discretion." *State v. Willis*, 496 S.W.3d 653, 726 (Tenn. 2016) (citing *State v. Carruthers*, 35 S.W.3d 516, 576-77 (Tenn. 2000); *State v. Van Tran*, 864 S.W.2d 465, 477 (Tenn. 1993); *State v. Banks*, 564 S.W.2d 947, 949 (Tenn. 1978)). This court "need not find that the trial court made the best decision or the one [this court] would have made; instead, [this court] must confine itself to determining whether the trial court's decision was within the range of acceptable alternatives." *Id.* at 729 (citing *Lee Med., Inc. v. Beecher*, 312 S.W.3d 515, 524 (Tenn. 2010)). This court "should permit a trial court's discretionary decision to stand if reasonable judicial minds can differ concerning its soundness." *Id.* (citing *White v. Vanderbilt Univ.*, 21 S.W.3d 215, 223 (Tenn. Ct. App. 1999)).

A photograph must be relevant to be admitted into evidence at trial. *See Banks*, 564 S.W.2d at 949; Tenn. R. Evid. 402. Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. Relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury." Tenn. R. Evid. 403. Unfair prejudice is "an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one." *Banks*, 564 S.W.2d at 951.

Gruesome, graphic, or horrifying photographs of a crime victim may be admitted into evidence if the photographs are relevant to an issue at trial and their probative value is not substantially outweighed by their prejudicial effect. *Id.* at 949-51. However, if the

photographs "are not relevant to prove some part of the prosecution's case, they may not be admitted solely to inflame the jury and prejudice them against the defendant." *Id.* at 951 (citing *Milam v. Commonwealth*, 275 S.W.2d 921 (Ky. 1955)). In determining the admissibility of the photographs, the trial court should consider

> their accuracy and clarity, and whether they were taken before the corpse was moved, if the position and location of the body when found is material; the inadequacy of testimonial evidence in relating the facts to the jury; and the need for evidence to establish a prima facie case of guilt or to rebut the defendant's contentions.

*Id.*; *see Willis*, 496 S.W.3d at 726. "[P]hotographs are not necessarily rendered inadmissible because they are cumulative of other evidence or because descriptive words could be used." *Willis*, 496 S.W.3d at 728 (quoting *State v. Williamson*, No. M2010-01067-CCA-R3-CD, 2011 WL 3557827, at *9 (Tenn. Crim. App. Aug. 12, 2011)). "Thus, the fact that the State could have made its case using only descriptive words is a consideration in balancing the probative value against the prejudicial effect, but does not mandate exclusion of the photographs." *Id.*

Our supreme court has recognized a "general policy of liberality" in the admission of photographic evidence. *Id.* at 729 (citing *Banks*, 564 S.W.2d at 949). "In determining whether to admit photographic evidence, we recognize 'the superior position of the trial court for balancing the probative value and prejudicial effect' of photos on the jury." *Id.* (quoting *State v. Sandles*, 740 S.W.2d 169, 177 (Mo. 1987) (en banc)).

On appeal, Defendant challenges the admission of all autopsy photographs, as well as the crime scene photograph of the victim's body. Although Defendant filed a motion prior to trial seeking the exclusion of all photographs of the victim, Defendant clarified at trial that he was objecting to one photograph of the victim's body at the crime scene and two autopsy photographs, one of which the trial court excluded. He abandoned his objection at trial to the admission of the remaining autopsy photographs and, therefore, he has waived his challenge to the trial court's admission of these autopsy photographs for purposes of appeal. *See* Tenn. R. App. P. 36(a) ("Nothing in this rule shall be construed as requiring relief be granted to a party responsible for an error or who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error."); *see also State v. Banks*, 271 S.W.3d 90, 170 (Tenn. 2008) (appendix) ("[A] party who invites or waives error, or who fails to take reasonable steps to cure an error, is not entitled to relief on appeal."). Thus, our review is limited to the trial court's admission of the one autopsy photograph and the one crime scene photograph specifically challenged by Defendant at trial and ruled upon as admissible by the trial court.

- 18 -

Exhibit 16, an autopsy photograph depicting the gunshot wound to the victim's jaw, was relevant in establishing the cause and manner of the victim's death and was indicative of Defendant's intent and premeditation. *See State v. Davidson*, 509 S.W.3d 156, 199 (Tenn. 2016) (recognizing that post-mortem photographs may be relevant to show how the victim died and to issues of premeditation and intent). Although the photograph may be gruesome, "it is because the crime depicted is of that sort." *Willis*, 496 S.W.3d at 729 (quoting *Sandles*, 740 S.W.2d at 177). A trial court may consider "the grotesque and horrifying nature of the conduct charged" in determining whether any prejudice to the defendant was unfair. *Id.* The trial court excluded a photograph that it determined was not a true reflection of the victim's injuries and ensured that the photograph admitted was the least gruesome photograph available that also accurately reflected the victim's injuries.

Exhibit 35 likewise was relevant to the issue of Defendant's intent and premeditation. The surveillance video of the shooting reflected that once the shooting began, the victim fell outside the view of the camera, and Exhibit 35 was the only photograph of the victim in the area in which he fell that was presented at trial. The State utilized Exhibit 35 in conjunction with other crime scene photographs and the surveillance video to illustrate the brutality of the shooting, the victim's location in the store, his proximity to the shooters, and the numerous shots fired at the victim, all of which assisted the State in establishing premeditation and intent. Although there was evidence of medical intervention reflected in the photograph, no evidence was presented that the victim was moved from another area of the store so that emergency personnel could provide such medical intervention. The State did not present the photograph as evidence of the exact position of the victim's body immediately following the shooting. Rather, Investigator Dabney identified the victim's position as the position in which he was lying when Investigator Dabney arrived and after attempts at medical intervention had ceased. The photograph was not excessively gruesome in light of the violent nature of the shooting and the numerous bullet wounds sustained by the victim.

We cannot conclude that the trial court's decision to admit the photographs was outside the range of "acceptable alternatives." *See Willis*, 496 S.W.3d at 729. Defendant failed to establish that the probative value of the photographs was substantially outweighed by the danger of unfair prejudice. *See id.* (upholding the trial court's admission of photographs when "the defendant failed to establish that the probative value of the photographs was substantially outweighed by the danger of unfair prejudice"). We conclude that the trial court did not abuse its discretion in admitting Exhibit 16 and Exhibit 35.

### III. Denial of Motions to Sit at Counsel Table

Defendant contends that the trial court erred in denying his multiple motions to sit with defense counsel at trial. He maintains that the trial court's decision to require

Defendant to sit behind defense counsel rather than with defense counsel "affected" his constitutional rights to counsel and to a fair trial and "ultimately impaired his presumption of innocence, his ability to communicate with counsel, and his ability to meaningfully participate in his own defense." Defendant argues that the trial court's decision was either a structural constitutional error, which required automatic reversal, or a non-structural constitutional error, which the State failed to establish was harmless beyond a reasonable doubt. The State responds that the trial court did not abuse its discretion in denying the motion due to security concerns, that the trial court's decision did not rise to the level of a constitutional violation, and that Defendant failed to establish that any error was harmless.

### A. Trial Proceedings

The record reflects that the jury was chosen from Davidson County, that jury selection took place in Nashville, and that the trial was held in Memphis. On the first day of voir dire, Defendant made an oral motion to be allowed to sit at counsel table with defense counsel during jury selection and at trial. Defense counsel argued that the jury's negative perception created by Defendant's sitting behind rather than beside defense counsel violated Defendant's right to a fair trial. Defense counsel argued that the seating arrangement negatively affected Defendant's "ability to fully engage with us and point out certain things to us" and, thus, violated Defendant's right to engage and assist his attorney in his defense. Defense counsel stated, "I understand the Court may have some security concerns, however, I don't think from our perspective those would be an issue in this case for [Defendant]."

The trial court denied Defendant's motion, stating

As [defense counsel] is fully aware of the Court's policy and feelings about this issue, the Court takes very seriously security, always has, always will. I usually defer to my security staff about this issue.

I also have the unique perspective in the fact that I have sat where [defense counsel] and co[-]counsel have sat for years so I understand what's going on over there. I understand the pressure of what's going on over there. I understand all of the utensils, gadgets, and all the other things that are on that table that you don't think twice about that you are not even aware of.

I must say that [Defendant] has always been respectful in my court. I've never had any problems with him. I don't think that I will ever have any problems with him. But I do have to take into consideration that he is an inmate, and we are here in a very serious matter. So for now I'm going to deny your motion.

- 20 -

During voir dire, defense counsel asked a potential juror whether Defendant's sitting behind defense counsel rather than at counsel table "makes you think he is less attentive." The potential juror responded, "No, sir, no."

At the beginning of trial in a Shelby County courtroom, Defendant renewed his motion to sit at counsel table. Defense counsel expressed concern that Defendant's sitting behind defense counsel might lead jurors to believe that Defendant did not care about his case, thus, impacting his right to a fair trial. Defense counsel argued that Defendant's ability to converse with defense counsel and "to view things without us having to turn around when the trial is going on is paramount to him being able to fully exercise his right to counsel." The trial court again denied the motion.

Prior to Smith's testimony at trial, the State addressed the trial court about security and safety concerns, noting that the case involved gangs on both sides. The State requested no video recording of Smith by the media due to ongoing security concerns at the jail. The trial court instructed the media not to record or photograph Smith.

Defendant raised the trial court's denial of his request to sit at counsel table as an issue in his motion for new trial. During the hearing on the motion for new trial, Defendant argued that the record did not establish that he "per se was a security risk" and that "a kind of theoretical security risk is an arbitrary reason not to allow someone to sit at counsel table." He contended that he was seated approximately five and one-half feet behind defense counsel, which "made it almost impossible" to interact with defense counsel and "affected" Defendant's right to participate in his defense. Defendant again argued that the seating arrangement caused the jury to perceive him negatively, which affected his presumption of innocence and his right to a fair trial. Defendant maintained that the trial court's denial of his motion was a structural error requiring reversal of his convictions.

The State responded that there were "extreme security concerns" throughout the trial. The State noted that the location of the jury selection was not disclosed to the public, that witnesses had police escorts to and from the courthouse, and that some "individuals" were placed in undisclosed locations. The State maintained that defense counsel was able to easily access Defendant during the trial and that the trial court did not restrict the movement of defense counsel or his assistant in communicating with Defendant.

The trial court made oral findings, acknowledging that Defendant never caused any problems in court but stated Defendant's claim of "theoretical security risks" was "false." The court reviewed findings it had made in denying Defendant's initial motion during jury selection and stated that the court "went into specifics about why this Court's continued practice is to not allow defendants to sit at the table. And I stand on that given the fact that the Court of Appeals has stated in the past that it's best practice that defendants sit at tables." The court noted that Defendant was always escorted to the proceedings by "DRT"

- 21 -

security, that the court was aware of the "security concerns" around Defendant throughout the trial, and that the court was "always acutely aware" of Defendant's location in the courtroom. The court stated that it deferred the courtroom's security to the deputies.

The court stated that it made efforts to ensure that there was no perception of Defendant being ostracized. The court found that Defendant was permitted to wear street clothes, was provided with paper, was not handcuffed, and was seated less than five and one-half feet from defense counsel. The court also found that Defendant and defense counsel had the "opportunity for meaningful interaction" throughout the trial. The court stated that defense counsel had the opportunity to question potential jurors during voir dire about the perception of Defendant's sitting behind defense counsel and the presumption of innocence. The court concluded that Defendant's seating arrangement did not affect the verdict or otherwise result in prejudice to the judicial process.

### B. Defendant's Sitting Behind Defense Counsel

A trial court's decision regarding whether a defendant should be permitted to sit at the table with defense counsel is reviewed for an abuse of discretion. *State v. Smith*, 492 S.W.3d 224, 243 (Tenn. 2016); *State v. Rice*, 184 S.W.3d 646, 674 (Tenn. 2006). "When a trial court exercises its discretion, it should place specific findings on the record to allow meaningful appellate review of the trial court's decision." *Smith*, 492 S.W.3d at 243 (citing *Am. Heritage Apartments, Inc. v. Hamilton Cnty. Water & Wastewater Treatment Auth.*, 494 S.W.3d 31, 51 (Tenn. 2016)).

In *State v. Rice*, our supreme court first addressed a trial court's order denying a defendant's request to sit at counsel's table at trial and instead requiring him to sit on a bench less than two feet behind counsel's table. *Rice*, 184 S.W.3d at 674. The defendant in *Rice* argued that the trial court's order violated his due process rights by eroding his presumption of innocence and denying him a fair trial. *Id.* Our supreme court determined that "[r]equiring the defendant to sit directly behind his attorneys is not the same as making the defendant wear prison attire or shackles in the courtroom, which would suggest to the jury that he is a danger." *Id.* at 675. The court concluded that the trial court's requiring the defendant to sit behind counsel's table was not an abuse of discretion, noting that the seating arrangement did not impact the defendant's ability to communicate with defense counsel or impair the defendant's presumption of innocence. *Id.* However, our supreme court stated that "it is the better practice to allow a defendant to sit at counsel table." *Id.* Our supreme court further concluded that the defendant failed to establish prejudice, recognizing that "a showing of prejudice is necessary in order to obtain relief." *Id.*

Our supreme court next addressed a trial court's denial of a defendant's request to sit at counsel table in *State v. Smith* and concluded that the trial court erred in denying the defendant's request to sit at counsel's table on the sole basis that the defendant was not an

attorney. *Smith*, 492 S.W.3d at 243-44. Our supreme court reasoned that "the fact that the Defendant is not an attorney is immaterial to the question of whether he should be permitted to sit at counsel table" and that "the trial court's reasoning directly conflicts with this Court's statement in *Rice* that 'it is the better practice to allow a defendant to sit at counsel table.'" *Id.* at 243 (quoting *Rice*, 184 S.W.3d at 675). Our supreme court cautioned that "[t]he instances are rare when the trial court should not allow the defendant to sit at counsel table." *Id.*

However, our supreme court concluded that the defendant failed to establish that the trial court's error "more probably than not affected the judgment or would result in prejudice to the judicial process." *Id.* at 244 (quoting Tenn. R. App. P. 36(b)). The court reasoned that the seating arrangement did not impact the defendant's presumption of innocence or his ability to communicate with defense counsel and that the defendant failed to specify any issue or objection that he was unable to communicate to defense counsel to raise as a result of his not sitting at counsel's table. *Id.* Our supreme court determined that the defendant failed to demonstrate prejudice and that, thus, the trial court's error was harmless. *Id.*

During the hearing on Defendant's motion for new trial, the trial court appeared to reference a policy of not allowing defendants to sit at counsel's table at trial. Any such policy conflicts with our supreme court's prior statements that "[t]he instances are rare when the trial court should not allow the defendant to sit at counsel table," *Smith*, 492 S.W.3d at 243, and that "it is the better practice to allow a defendant to sit at counsel table," *Rice*, 184 S.W.3d at 675. However, the trial court also made findings at trial and the motion for new trial hearing regarding the unique security issues involved in the instant case and denied Defendant's request to sit at counsel's table as a security precaution. *State v. Carpenter*, No. W2022-01710-CCA-R3-CD, 2023 WL 6441953, at *10-11 (Tenn. Crim. App. Oct. 3, 2023) (relying on the trial court's findings in the motion for new trial hearing in upholding the trial court's decision to disallow the defendant to sit at counsel's table); *State v. Walker*, No. W2019-00751-CCA-R3-CD, 2021 WL 4496508, at *7 (Tenn. Crim. App. Oct. 1, 2021) (relying on the trial court's findings at trial and during the motion for new trial hearing in upholding the trial court's decision regarding the seating arrangement). Generally, this court is bound by the factual findings of the trial court unless the evidence preponderates against them. *See Carpenter*, 2023 WL 6441953, at *11 (citing *Kendrick v. State*, 494 S.W.3d 450, 479 (Tenn. 2015)). Furthermore, this court also has upheld a trial court's denial of a defendant's motion to sit at counsel's table based, in part, on the trial court's "concerns about security and the effect on the jury of having deputies located near the Defendant." *Carpenter*, 2023 WL 6441953, at *11.

Defendant fails to cite to any authority establishing a constitutional right to sit at counsel's table. *See Carpenter*, 2023 WL 6441953, at *11; *Walker*, 2021 WL 4496508, at

*7; *see also United States v. Darden*, 364 F. Supp. 3d 798, 800 (M.D. Tenn. 2019) (providing that "neither the Sixth Amendment, nor federal law mandates that [sitting at counsel's table] is constitutionally required"). Although we reiterate that "it is the better practice to allow a defendant to sit at counsel table," we cannot conclude that the trial court abused its discretion or violated Defendant's constitutional rights in denying his motion to sit at counsel's table at trial due to security concerns. *See Rice*, 184 S.W.3d at 675.

Furthermore, Defendant has failed to establish that the trial court's decision "more probably than not affected the judgment or would [have] result[ed] in prejudice to the judicial process." *Smith*, 492 S.W.3d at 244 (quoting Tenn. R. App. 36(b)). Defendant did not establish that he was unable to communicate with defense counsel; rather, the trial court found that Defendant and defense counsel had the "opportunity for meaningful interaction" throughout the trial. Nothing in the record suggests that the seating arrangement impacted Defendant's presumption of innocence and right to a fair trial. The trial court noted that Defendant had the opportunity to question jurors about the seating arrangement during voir dire, and Defendant, in fact, questioned one potential juror, who stated that the seating arrangement would not lead the potential juror to believe Defendant would be less attentive at trial.

## IV. Closing Arguments

Defendant contends that the prosecutor's comments regarding a missing witness during closing arguments improperly "strayed from the evidence and the reasonable inferences to be drawn from the evidence." Defendant acknowledges that he failed to object to the comments but argues that the comments rise to the level of plain error. The State responds that Defendant failed to establish plain error. We agree with the State.

After the State rested its proof at trial, Defendant asked the trial court to provide an absent material witness instruction based on the State's failure to call co-defendant Govan, who had entered a proffer agreement, as a witness at trial. The trial court granted Defendant's request and instructed the jury regarding the requirements necessary for determining whether a person qualifies as an absent material witness and the inferences to be drawn from the potential testimony of an absent material witness.

During closing arguments, defense counsel argued that Govan was a material witness who the State failed to call at trial. Defense counsel stated Govan was a cooperating witness who met with investigators on multiple occasions and entered into a proffer agreement, that only the State had the ability to call him as a witness, and that the jury should infer that Govan's testimony would have been unfavorable to the State. During rebuttal closing arguments, the prosecutor stated:

What do we know about Hernandez Govan? He's a defendant in the case. He is charged with murder and conspiracy to murder. Whether it's from television or whether it's in black and white at the bottom of that same instruction, a defendant has the right not to testify and incriminate himself. He is a defendant. He is not a missing witness. That would be inane.

I could willy-nilly just start calling every defendant and they just have to come in here and testify. That's crazy. It doesn't even work like that on television. It doesn't even work like that in black and white in front of you. That would be insanity and that wouldn't be a legal system where you had a Fifth Amendment right. That would be an inquisition actually is what they used to call it where you didn't have that right not to come in the courtroom.

So the idea that the defense would call a defendant who's charged with this crime an absent witness shows you how desperate it is.

Closing arguments serve "to sharpen and to clarify the issues that must be resolved in a criminal case" and enable "the opposing lawyers to present their theory of the case and to point out the strengths and weaknesses in the evidence to the jury." *Banks*, 271 S.W.3d at 130 (citations omitted). Because counsel in criminal cases are "expected to be zealous advocates," they are afforded "great latitude in both the style and the substance of their arguments." *Id*. at 130-31 (citations omitted). "[A] prosecutor's closing argument must be temperate, must be based on the evidence introduced at trial, and must be pertinent to the issues in the case." *Id.* at 131 (citations omitted). "[P]rosecutors, no less than defense counsel, may use colorful and forceful language in their closing arguments, as long as they do not stray from the evidence and the reasonable inferences to be drawn from the evidence, or make derogatory remarks or appeal to the jurors' prejudices." *Id*. (citations omitted). Although not exhaustive, this court has recognized five general areas of potentially improper prosecutorial argument: (1) intentionally misstating the evidence or misleading the jury as to the inferences it may draw; (2) expressing personal beliefs or opinions as to the truth or falsity of any testimony or the guilt of the defendant; (3) inflaming or attempting to inflame the passions or prejudices of the jury; (4) injecting issues broader than the guilt or innocence of the accused under controlling law, or making predictions regarding the consequences of the jury's verdict; and (5) arguing or referring to facts outside the record unless the facts are matters of common knowledge. *State v. Goltz*, 111 S.W.3d 1, 6 (Tenn. Crim. App. 2003).

However, "[a] criminal conviction should not be lightly overturned solely on the basis of the prosecutor's closing argument." *Banks*, 271 S.W.3d at 131. Instead, "[a]n improper closing argument will not constitute reversible error unless it is so inflammatory or improper that i[t] affected the outcome of the trial to the defendant's prejudice." *Id*. The following factors should be considered when making this determination:

> (1) the conduct complained of viewed in context and in light of the facts and circumstances of the case; (2) the curative measures undertaken by the [c]ourt and the prosecution; (3) the intent of the prosecutor in making the improper statement; (4) the cumulative effect of the improper conduct and any other errors in the record; and (5) the relative strength or weakness of the case.

*State v. Buck*, 670 S.W.2d 600, 609 (Tenn. 1984) (quoting *Judge v. State*, 539 S.W.2d 340, 344 (Tenn. Crim. App. 1976)); *see also Goltz*, 111 S.W.3d at 5-6.

Defendant concedes that he did not contemporaneously object to the State's argument in the trial court. Our supreme court "has long held that a defendant's failure to contemporaneously object to alleged prosecutorial misconduct during closing argument results in waiver of the issue on appeal." *State v. Enix*, 653 S.W.3d 692, 700 (Tenn. 2022). Defendant argues that the State's comments rise to the level of plain error. "[P]lain error review is the appropriate standard of review to apply to claims of alleged prosecutorial misconduct during closing argument when no contemporaneous objection was lodged at the time of the alleged misconduct but the claim is raised in the motion for a new trial." *Id*. at 700-01.

"When necessary to do substantial justice, an appellate court may consider an error that has affected the substantial rights of a party at any time, even though the error was not raised in the motion for a new trial or assigned as error on appeal." Tenn. R. App. P. 36(b). Plain error review should be "sparingly exercised[,]" *see State v. Bledsoe*, 226 S.W.3d 349, 354 (Tenn. 2007), and confined to errors that are "especially egregious in nature, striking at the very heart of the fairness of the judicial proceeding," *State v. Page*, 184 S.W.3d 223, 231 (Tenn. 2006).

When considering a claim under the plain error doctrine, this court considers whether:

> (1) the record clearly establishes what occurred in the trial court; (2) a clear and unequivocal rule of law was breached; (3) a substantial right of the accused was adversely affected; (4) the issue was not waived for tactical reasons; and (5) consideration of the error is necessary to do substantial justice.

*State v. Linville*, 647 S.W.3d 344, 353-54 (Tenn. 2022) (citation omitted); *see also State v. Smith*, 24 S.W.3d 274, 282 (Tenn. 2000). To obtain relief under this doctrine, the defendant bears the burden of persuading this Court "that the trial court committed plain error" and that the error was of sufficient magnitude "that it probably changed the outcome of the trial." *Bledsoe*, 226 S.W.3d at 354 (Tenn. 2007) (first quoting *State v. Adkisson*, 899 S.W.2d 626, 642 (Tenn. Crim. App. 1994), and then citing *United States v. Olano*, 507 U.S. 725, 731-32 (1993)). Importantly, "complete consideration of all the factors is not necessary when it is clear from the record that at least one of the factors cannot be established." *State v. Martin*, 505 S.W.3d 492, 504 (Tenn. 2016) (quoting *Smith*, 24 S.W.3d at 283). "Whether the elements of the plain error doctrine have been satisfied is a question of law." *Linville*, 647 S.W.3d at 354 (quoting *State v. Knowles*, 470 S.W.3d 416, 423 (Tenn. 2015)).

Defendant asserts that the prosecutor intentionally misstated the evidence produced at trial and misled the jury on the reasonable inference that could be drawn from the State's decision not to call Govan as a witness. Defendant maintains that the prosecutor implied that Govan invoked his constitutional privilege against self-incrimination and improperly suggested that calling Govan as a witness "would lead to the erosion of constitutional safeguards."

However, the evidence of Defendant's guilt was overwhelming, and the prosecutor's comments were brief. Given the testimony of witnesses showing that Defendant planned and carried out the murder of the victim, which was caught on video and corroborated by cell phone records, surveillance videos, and other evidence recovered by police during their investigation as well as the trial court's instruction that the arguments of counsel were not evidence, Defendant has failed to establish that consideration of the alleged errors is "necessary to do substantial justice" or that any such error was of "'sufficient magnitude that it probably changed the outcome of the trial,'" *Martin*, 505 S.W.3d at 504 (quoting *Smith*, 492 S.W.3d at 232). Because Defendant failed to establish plain error, he is not entitled to relief on this issue.

## V. Cumulative Error

Finally, Defendant asserts that the cumulative effect of the errors entitles him to a new trial. The cumulative error doctrine recognizes "that there may be multiple errors committed in trial proceedings, each of which in isolation constitutes mere harmless error, but which when aggregated, have a cumulative effect on the proceedings so great as to require reversal in order to preserve a defendant's right to a fair trial." *State v. Hester*, 324 S.W.3d 1, 76 (Tenn. 2010); *see State v. Leath*, 461 S.W.3d 73, 116 (Tenn. Crim. App. 2013). Because Defendant has failed to establish any error warranting relief, he is not entitled to relief under the cumulative error doctrine.

## Conclusion

Upon reviewing the record, the parties' briefs and oral argument, and the applicable law, we affirm the judgments of the trial court.


s/ Matthew J. Wilson
MATTHEW J. WILSON, JUDGE
